FILED

MAR 14 2022

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

C22-01585

1  Tatyana Evgenievna Drevaleva

2  1099 Fillmore St., Apt. 5N, San Francisco, CA, 94115

3  Cell 628-688-6167, tdrevaleva@gmail.com

4  Plaintiff in Pro Per

5            THE UNITED STATES DISTRICT COURT

6         FOR THE NORTHERN DISTRUCT OF CALIFORNIA

7



8  Tatyana Evgenievna. Drevaleva            )   ~~Second Amended~~ Complaint for
                                            )
9            *Plaintiff - Petitioner*       )   Damages,
                                            )
10           vs.                            )   1) Deprivation me of the Protection by
                                            )       of the Eighth, the Thirteenth, and the
11                                          )       Fourteenth Amendments (both the
   1)  Alameda Health System               )
12                                          )       Substantive and the Procedural Due
   2)  The California Department of Industrial )    Process Clauses) to the U.S.
13       Relations (the DIR)                )
                                            )       Constitution, 42 U.S.C. § 1983;
14           *Defendants.*                  )
                                            )   2) Deprivation me of the Protection by
15                                          )       the National Labor Relations Act (the
                                            )       NLRA) and the Labor Management
16                                          )
                                            )       Relation Act (the LMRA);
17                                          )       42 U.S.C. § 1983;
                                            )
18                                          )   3) Deprivation of my Civil Rights
                                            )       Because I am Russian,  42 U.S.C. §
19                                          )
                                            )       1981;
20                                          )
                                            )   4) Civil Conspiracy that was Aimed to
21                                          )       Deprive me of the Protection of the
                                            )
22                                          )       U.S. Constitution and Federal Laws,
                                            )       42 U.S.C. § 1985;
23                                          )
                                            )   5) Fraud, Penal C. § 484; Civ. C. § 1572
24                                          )
                                            )   6) Harassment, C.C.P. § 527.6
25                                          )
                                            )   7) The Intentional Infliction of Emotional
26                                          )
                                            )       Distress,
27                                          )
28  _____)

Complaint for Damages.

|  |  |
|---|---|
| ) | 8) The Intentional Interference with a Prospective Economic Advantage, |
| ) | |
| ) | 9) Loss of Consortium |
| ) | 10) Violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962. |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | Demand for a Jury Trial. |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | |
| ) | |

1. Comes now Plaintiff Tatyana Evgenievna Drevaleva and submits the Second Amended Complaint for Damages against the following Defendants:

    1) The Alameda Health System

    2) The California Department of Industrial Relations.

**2. Original Jurisdiction.** The U.S. District Court for the Northern District of California has a Federal question jurisdiction over my Complaint because multiple Federal statutes are involved.

**3. Supplemental Jurisdiction**. Because the U.S. District Court has an original jurisdiction over my Petition, the District Court also has Supplemental Jurisdiction over my State of California claims pursuant to 28 U.S. Code § 1367. Supplemental jurisdiction.

**4. Venue** is appropriate in this Court because the Alameda Health System and the Department of Industrial Relations are located at the Alameda County.

5. Plaintiff Tatyana Drevaleva is a former Part Time employee (a Monitor or a Telemetry Technician) of the Alameda Health System, a claimant at the California Department of Industrial Relations, the Division if Labor Standards Enforcement, and a Plaintiff in the lawsuit No. 3:16-cv-07414-LB *Drevaleva v. 1) Alameda Health System, 2) Department of Industrial Relations*.

Complaint for Damages.

**6. Statement of Facts.** From April 01 to September 07, 2013, I was employed by the Alameda Health System for a Part Time job as a Monitor (Telemetry) Technician observing cardiac monitors. Prior to being hired, I was fully qualified for this job. I possessed a certificate of an Electrocardiography Technician that I earned at the City College of San Francisco in 2009. I also possessed over 100 hours of the Electrocardiography Internship at the Kanbar Cardiac Center at the California Pacific Medical Center in San Francisco, CA. I also possessed a few years of experience working as an Electrocardiography Technician and as a Monitor Technician at leading hospitals of the Northern California such as the U.C. Davis Medical Center, Kaiser Permanente Medical Centers in Walnut Creek and in Oakland, the LifeWatch, Inc. in San Francisco, and the San Francisco VAMC. I also possessed good Letters of Reference from my previous employers, and I possessed a good Performance Evaluation from the San Francisco VAMC.

7. However, I was a contractor at the San Francisco VAMC in 2012 - 2013, and that job was not permanent. I was attempting to find a permanent job. In approximately February 2013, I applied for a Part Time job of a Monitor Technician at the Alameda Health System, the Highland Hospital in Oakland, CA. I successfully had a job interview, and I was hired for this job.

8. On March 11, 2013, I received an Offer Letter from Healthcare Recruiter of Alameda Health System Mr. Kevin Silvestre (**ER 07414 Vol. 1, page 13**) that said,

> "I am providing you with an offer of employment via e-mail! The information is as follows:
>
> - <u>Position Title</u> – Telemetry Monitor Technician
> - <u>Status</u> – 0.8 FTE (part-time and benefit-eligible)
> - <u>Shift</u> – Evenings (3:00 pm to 11:30 pm)
> - <u>Rate of Pay</u> - $21.48/hour
> - <u>Applicable Differentials</u> – 11% for evenings, 15.5% for nights & 5% for weekends."

9. Please, notice that the employer who offered me a job had a name the Alameda Health System and not the Alameda County Medical Center.

Complaint for Damages.

10. I accepted this job offer. The scope of my practice as a Monitor Technician was only to observe cardiac monitors and only to observe the electrocardiograms of approximately 30 patients who were located at the Step Down Unit of the Highland Hospital of the Alameda Health System. The scope of my practice as a Monitor Technician was not to render any medical assistance to any patient of the Highland Hospital. Pursuant to the scope of my practice, I was obligated to observe the Electrocardiograms of the patients, to print out the Rhythm Strips (the samples of the Electrocardiograms) every few hours, and I was obligated to inform the Registered Nurses and the Medical Doctors about the critical changes on the Electrocardiograms. I was not allowed to leave my cardiac monitoring station without asking another person (another Monitor Technician or a Registered Nurse) to substitute me observing the cardiac monitors. Even in cases of emergency, I was not allowed to leave my cardiac monitoring station without making sure that another person observes the Electrocardiograms. If there was nobody available to substitute me to observe the cardiac monitors, I was obligated to stay next to the cardiac monitoring station at all times even in cases of emergency.

11. On March 13, 2013, I received a Welcome Letter from Healthcare Recruiter of Alameda Health System Mr. Kevin Silvestre (**ER 17-16382 Vol. 1, pages 1008-1009**) that said, "Dear Tatyana! Welcome to Alameda Health System! We are pleased that you have chosen to work with us as a Telemetry Monitor Technician in the SDU (Step Down Unit) Department at the Highland General Hospital Campus. Your position is a part time evening shift (0.8 FTE) with an hourly rate of $21.48… . Your Department Leader will be Verrilien Clerve…"

"The Telemetry Monitor Technician job classification is represented by the SEIU Bargaining Unit."

"You must read, sign and return the enclosed employment contingency form prior to employment…"

12. Unfortunately, I don't have a copy of my employment contingency form that I allegedly signed and returned to the Human Resources of the Alameda Health System. However, please, notice that I discovered that I was hired on an "employment contingency" basis only on January 20, 2021, and therefore I discovered that AHS had committed fraud because it

Complaint for Damages.

1   announced to me that I was a Part Time employee but it actually hired me on an "employment

2   contingency" basis.

3       13. Please, notice that the name of the employer who sent me a Welcome Letter was the

4   Alameda Health System and not the Alameda County Medical Center.

5       14. Please, notice that the Welcome Letter specifically said that my position as a Monitor

6   Technician was represented by the Union. Prior to the beginning of my employment at AHS, I

7   signed a document at Human Resources that I agreed to be represented by the Union.

8       15. I accepted this job offer, and I started to work on April 01, 2013.

9       16. From April 01, 2013 to approximately May 15, 2013, I worked as I had been

10  promised, means I worked for four eight hour shifts per week that was 32 hours per week. To the

11  best of my knowledge, I worked during day and evening shifts. However, during that time I was

12  not receiving the promised shift differentials such as 11% for evenings, 15.5% for nights & 5%

13  for weekends.

14      17. After the beginning of my employment with AHS, Mr. Verrilien Clerve informed me

15  that my affiliation to the Union had been terminated, and the document with my signature that I

16  agreed to be represented by the Union was destroyed without letting me know first. I asked Mr.

17  Clerve why AHS initially compelled me to sign a document that I agreed to be represented by

18  the Union and later rescinded my affiliation to the Union. Mr. Clerve didn't answer this question.

19      18. Starting approximately May 15, 2013, Mr. Clerve informed me that the 8 hour day

20  and evening shifts were no longer available, and that my only option was to work for three 12

21  hour shifts per week that was 36 hours per week. I accepted this offer because I had no other

22  choice.

23      19. On January 20, 2021, I discovered that, because AHS coerced me to work for 12 hour

24  shifts, and because Clerve said that the 12 hour shift was the only available option for me, AHS

25  acted in violation of the Memorandum of Understanding between SEIU Local 1021 – General

26  Chapter and the Alameda County Medical Center (January 1, 2012 to March 31, 2014) (further,

27  the MOU) (**ER 07414 Vol. 1, page 25**),

28

Complaint for Damages.

"84. The twelve (12) hour position will be filled according to seniority in the unit and will be strictly voluntary, creating an integrated eight (8) and twelve (12) hour schedule.

85. Employees participating in the twelve (12) shift program will commit themselves to working a twelve (12) hour shift on a continuing basis. If the employee chooses to cease working a twelve (12) hour shift, he/she must provide written notice to the manager. The manager will make a reasonable effort to find a replacement to convert the employee back to an eight (8) hour schedule."

20. Also, see (**ER 07414 Vol. 1, page 27**) which is the separate pages from the Alameda County Medical Center Human Resources Policy and Procedure Manual (further, the HRPPM), "A regularly scheduled, full-time shift is normally 8 hours per day with ½ hour for lunch."

21. Therefore, on January 20, 2021 I discovered that AHS had committed fraud, and AHS coerced me to work for 12 hour shifts asserting that it was the only available option for me. In fact, pursuant to the MOU, 12 hour shifts were strictly voluntary, and I had an opportunity to continue working for 8 hour shifts. Moreover, Mr. Clerve never asked me to give him a written notice that I agreed to work for 12 hour shifts.

**22. Overtime Payments.** Starting approximately May 15, 2013, I worked for three 12 hour night shifts per week that was 36 hours per week. Pursuant to the California Labor Code Section 510(a), AHS was obligated to pay me overtime x1.5 to my basic pay rate $21.48 for working in excess of 8 hours per day. Read Labor Code Section 510, "(a) Eight hours of labor constitutes a day's work. Any work in excess of eight hours in one workday … shall be compensated at the rate of no less than one and one-half times the regular rate of pay for an employee."

However, AHS never paid me this overtime payment.

"The word "shall" generally connotes a mandatory obligation.  (*Abbett Electric Corp. v. Storek* (1994) 22 Cal.App.4th 1460, 1469-1470, 27 Cal.Rptr.2d 845.)   "Thus, 'in most cases,'

Complaint for Damages.

1   the Legislature's use in a statute of the word 'shall' indicates that the statute's 'provisions are

2   mandatory.' " (*Id.* at p. 1470, 27 Cal.Rptr.2d 845.)"

3        Also, please, see the California Government Code, Section 14, " "Shall" is mandatory

4   and "may" is permissive."

5        Read *Tin Cup, LLC, an Alaska limited liability company, v. United States Army Corps of*

6   *Engineers*, No. 17-35889 (9th Circuit, 2018), "Indeed, the first paragraph uses the mandatory

7   term "shall," while the second paragraph uses the word "will." The Supreme Court has

8   distinguished descriptive "will" statements from mandatory "shall" statements. *See Norton v.*

9   *Southern Utah Wilderness Alliance*, 542 U.S. 55, 69 (2004) (concluding that a statute's

10   requirement that an agency "shall" act in accordance with a land use plan was a mandatory

11   statement.")…

12        Had Congress intended to bind the Corps, it would have used the word "shall." This

13   interpretation comports with the "well established canon of statutory interpretation that the use of

14   different words or terms within a statute demonstrates that Congress intended to convey a

15   different meaning for those words." *S.E.C. v. McCarthy*, 322 F.3d 650, 656 (9th Cir. 2003)

16   (collecting cases).

17        … The Corps' interpretation of the provision at issue—that "shall" connotes a mandatory

18   obligation and "will" connotes a description of what Congress expected to happen—is a

19   reasonable reading of the statute. It cannot be said that the language of the statute "admits of no

20   other reasonable interpretation" than the interpretation that Tin Cup has proffered. *Minis*, 40 U.S.

21   at 445 [*Minis v. United States*, 40 U.S. (15 Pet.) 423 (1841)].

22

23        **23. Shift Differentials.** AHS didn't pay me the promised shift differentials 11% for

24   evenings, 15.5% for nights & 5% for weekends.

25        See (**ER 07414 Vol. 3, page 614**) which is a copy of my schedule from 07/21/2013 to

26   08/17/2013 that demonstrated that I was working for three 12 hour night shifts per week that was

27   36 hours per week.

28

Complaint for Damages.

See (**ER 07414 Vol. 3, pages 612-613**) which is my pay stub dated 08/30/2013 that demonstrated that I was not receiving the promised shift differentials 11% for evenings, 15.5% for nights & 5% for weekends.

Please, notice that, pursuant to the MOU, my employer was obligated to pay me shift differentials 11% for evenings, 15.5% for nights & 5% for weekends.

See (**ER 07414 Vol. 3, page 492**) which is a separate page from the MOU,

> "223.

> B. Employees who work a PM shift shall be paid a differential of eleven percent (11 %) calculated on their base pay.

> C. Employees who work a night shift shall be paid a differential of fifteen and one half percent (15.5%) calculated on their base pay."

Also, see (**ER 07414 Vol. 3, pages 468-469**) which are the separate pages from the MOU,

> "88. Shift differentials will be calculated when actual hours are worked using the following table:

> 7:00 a.m. - 3:00 p.m. (day)

> 3:00 p.m. - 11 :00 p.m. (pm)

> 11 :00 p.m. - 7:00 a.m. (night)

> The shift differential rates shall be the applicable rates in Section 15.3 Paragraph 221."

However, AHS didn't pay me these shift differentials.

**24. My entitlement to a Full Time employment status.** Pursuant to the MOU, I was entitled to be considered as a Full Time Employee for the purpose of benefits and retirement because I worked for 36 hours per week. See (**ER 07414 Vol. 1, page 25**), "86. Full-time participating staff will work three (3) twelve (12) hour shifts (36 hours) in a work week and be compensated for 36 hours per week and be granted benefits equivalent to that of an employee

Complaint for Damages.

working full-time (40 hours) in a work week. Vacation, educational leave, holiday and sick leave accruals will be equivalent to those for full-time employees."

Please, see an analogous provision in the Alameda County Medical Center Human Resources Policy and Procedure Manual (further, the HRPPM) (**ER 07414 Vol. 1, page 28**), "3. The Twelve (12) Hour Shift – Twelve hour shifts for eligible nursing department employees may be implemented at the discretion of the department head. Full-time participating staff will work three twelve hour shifts for a total of 36 hours in a workweek and will be compensated with pay and benefits equivalent to that of an employee working full-time (40 hours) in a workweek."

Please, see a copy of my schedule that confirmed that I was working for three 12 hour shifts per week that was 36 hours per week (**ER 07414 Vol. 3, page 614**.)

However, despite I was working for 36 hours per week, and despite I was entitled to be considered as a Full Time employee for the purpose of benefits, AHS kept my status as a Part Time employee. I was not receiving my retirement, and I was overpaying for my health insurance. I was also not receiving my educational benefits.

**25. 15 minute rest periods.** Pursuant to the HRPPM regulation, AHS was obligated to provide employees who worked for 8 hour shifts with two 15 minute breaks (**ER 07414 Vol. 2, page 368**), "During each work period of eight working hours, full-time non-exempt employees are provided with two 15-minute paid rest periods and either one 30-minute or one hour unpaid meal period."

See (**ER 07414 Vol. 2, page 365**), "Rest Period A rest period of not more than 15 minutes shall normally be granted for each work period of three continuous hours or more, not to exceed two rest periods per workday."

However, because I worked for 12 hour shifts, I was entitled to get three paid 15 minute breaks. See the MOU regulation (**ER 07414 Vol. 3, page 469**), "89. Participating staff will receive three (3) fifteen (15) minute paid breaks and one (1) thirty (30) minute unpaid meal break."

Complaint for Damages.

However, depending on the Charge Nurse who worked with me, sometimes I got two 15 minute breaks for a 12 hour shift, and sometimes I got three 15 minute breaks.

Pursuant to Labor Code Section 226.7(c), AHS was obligated to pay me wages (see *Murphy v. Kenneth Cole Productions*, S140308, the California Supreme Court (2007)) in an amount of 1 hour of my work for each missed 15 minute break.

Read Labor Code Section 226.7,

> "(b) An employer shall not require an employee to work during a meal or rest or recovery period mandated pursuant to an applicable statute, or applicable regulation, standard, or order of the Industrial Welfare Commission, the Occupational Safety and Health Standards Board, or the Division of Occupational Safety and Health.

> (c) If an employer fails to provide an employee a meal or rest or recovery period in accordance with a state law, including, but not limited to, an applicable statute or applicable regulation, standard, or order of the Industrial Welfare Commission, the Occupational Safety and Health Standards Board, or the Division of Occupational Safety and Health, the employer shall pay the employee one additional hour of pay at the employee's regular rate of compensation for each workday that the meal or rest or recovery period is not provided."

However, AHS never paid me these wages.

**26. My entitlement to 10 minute occupational breaks every hour.** Pursuant to the HRPPM regulation, AHS was obligated to give me 10 minute paid breaks every hour because I was constantly observing video display screens (cardiac monitors) for more than two hours per day.

See (**ER 07414 Vol. 2, page 368**), "Employees using video display screens 2 consecutive hours or more are entitled to a 10-minute break every hour."

However, AHS never gave me these 10minute breaks.

Complaint for Damages.

**27. The July 2013 incident with Patient Mr. X.** In July 2013, I was working a night shift observing cardiac monitors. Among other patients, I was observing the Electrocardiogram of Patient Mr. X. The cardiac monitoring station was located in a hallway in the middle of the Step Down Unit. The patient's Nurse's name was Kim, and the name of the Charge Nurse was Beverly.

Initially, I was observing the Patient Mr. X. had a Normal Sinus Rhythm which is a norm for the Electrocardiograms. At approximately 4.00 AM, I witnessed that Nurse Kim was standing in the hallway next to the cardiac monitoring station, and she was reporting to Charge Nurse Beverly that Patient Mr. X. was unconscious, and that the patient didn't respond to a touch and to a conversation. I was unpleasantly surprised that Nurse Kim had left the unconscious patient alone in his room. I observed that Nurse Kim was moving too slowly in the hallway, and she was not in hurry to help the patient who was unconscious. At the time when Nurse Kim was speaking to Nurse Beverly, I was still observing the Electrocardiogram (EKG) of Patient Mr. X., and I was observing the Normal Sinus Rhythm.

Afterwards, I observed a series of abnormal changes on Mr. X.'s EKG that occurred intermittently with the episodes of the Normal Sinus Rhythm. I interpreted these changes as Artifacts that could be due to the interactions of the Telemetry equipment with other medical equipment, due to the patient's incidental body movements, of due to the malfunction of the Telemetry equipment. Usually, Artifacts should have a differential diagnosis with Ventricular Tachycardia (the VTach) that is a lethal cardiac rhythm. Frequently, Artifacts and VTach have a very similar pattern on the EKG. However, there are definite significant differences that help the Monitor Technicians, the Nurses, and the Doctors to make a correct differential diagnosis between the Artifacts and the VTach. Evaluating the abnormalities on the Patient Mr. X.'s EKG, and using my knowledge from the EKG textbooks and from my previous experience working as a Monitor Technician, I interpreted the changes on the Patient Mr. X.'s EKG as Artifacts and not as the VTach.

I printed out the Rhythm Strips with the episodes of these abnormal changes and with the episodes of the intermittent Normal Sinus Rhythm. I reported these abnormal changes on the

Complaint for Damages.

Patient Mr. X.'s EKG to Nurse Kim and to Charge Nurse Beverly. I explained to Nurses Kim and Beverly the reason why I thought that these abnormal changes were Artifacts and not a Ventricular Tachycardia that is a lethal cardiac rhythm.

I also reported these changes on the Patient Mr. X.'s ELG to Medical Doctor Mr. Sina Rachmani, and I expressed my opinion that these changes were the Artifacts. I explained to Dr. Rachmani why I thought that these changes were Artifacts and not a Ventricular Tachycardia that is a lethal cardiac rhythm. Dr. Rachmani clarified if I was reporting the Electrocardiogram of the Patient Mr. X. who was unconscious, and I confirmed that yes, I was reporting the abnormal changes on the Electrocardiogram of the Patient Mr. X. who was unconscious.

Dr. Rachmani evaluated the EKG of the Patient Mr. X., and Dr. Rachmani agreed with my EKG interpretation that these abnormal changes on the SKG were Artifacts and not the Ventricular Tachycardia that is a lethal cardiac rhythm. Dr. Rachmani's exact words were, "I agree with you."

Because the patient Mr. X. was unconscious, and because he didn't respond to a touch and to a conversation, Charge Nurse Beverly called the Code Blue Team of the Highland Hospital. The Code Blue Team arrived shortly, disconnected the Patient Mr. X. from the cardiac monitoring station of the Step Down Unit, and connected the patient to their own medical equipment that allowed the Code Blue Team to perform a Cardiopulmonary resuscitation on the patient and to observe the EKG.

The Patient Mr. X. passed away. In the morning, after my night shift, I reported the incident with the patient to a newly appointed Director of the Step Down Unit Mr. Gilbert Harding and to my co-worker, also a Monitor Technician Ms. Doniea Lawson. I reported the abnormal changes on the Patient Mr. X's Electrocardiogram. I explained to both Mr. Harding and to Ms. Lawson why I thought that these changes were Artifacts and not the Ventricular Tachycardia. I also reported to both Mr. Harding and Ms. Lawson that I had reported these abnormal changes on the Patient Mr. X.'s Electrocardiogram to Nurse Kim and Change Nurse Beverly. I also reported to both Mr. Harding and Ms. Lawson that I had reported these abnormal changes on the Patient Mr. X.'s Electrocardiogram to Medical Doctor Mr. Sina Rachmani who

1  agreed with my EKG interpretation that these abnormal changes were the Artifacts and not the

2  Ventricular Tachycardia.

3      After the incident with Patient Mr. X., the Alameda Health System conducted an internal

4  investigation of the events that surrounded the patient's death. I attended three Root Cause

5  Analysis (the RCA) meetings where I demonstrated to many Medical Doctors and Registered

6  Nurses the pattern of the abnormalities on the Patient Mr. X.'s Electrocardiogram that were

7  followed by the Normal Sinus Rhythm. During three RCA meetings, I explained to many

8  Medical Doctors and Registered Nurses why I interpreted these abnormal changes on the Patient

9  Mr. X.'s Electrocardiogram as Artifacts and not as Ventricular Tachycardia. During three RCA

10  meetings, I also explained to many Medical Doctors and Registered Nurses that I had reported

11  these abnormal changes on the Patient Mr. X.'s Electrocardiogram to the patient's Nurse Kim, to

12  Change Nurse Beverly, and to Medical Doctor Mr. Sina Rachmani who agreed with my EKG

13  interpretation that these abnormal changes were Artifacts and not the Ventricular Tachycardia. I

14  also explained to many Medical Doctors and Registered Nurses that I had reported these

15  abnormal changes on the Patient Mr. X.'s Electrocardiogram to Director of Step Down Unit Mr.

16  Gilbert Harding and to my co-worker Ms. Doniea Lawson.

17      The incident with the Patient Mr. X.  occurred in July 2013. After this incident, after the

18  internal AHS's investigation, and after three Root Cause Analysis meetings, I was allowed to

19  continue performing my duties as a Monitor Technician observing cardiac monitors. My

20  professional certificate of an Electrocardiography Technician was not suspended and not

21  revoked. My professional certification as a Certified Cardiographic Technician (CCT) was not

22  suspended and not revoked, and this certificate remained valid and visible on the web-site of the

23  Cardiovascular Credentialing International (CCI.) After the incident with the Patient Mr. X., I

24  didn't have a verbal warning, I was not written up, and I was not subjected to a progressive

25  discipline. After the incident with the Patient Mr. X., nobody told me that I had committed

26  medical negligence towards the patient.

27      Pursuant to the California Business and Professions Code, Section 800(a), the Alameda

28  Health System had a mandatory obligation to report all incidents of the medical negligence

Complaint for Damages.

towards patients to the appropriate medical Board. Please, see the California Business and Professions Code, Section 800, "(a) The Medical Board of California, the California Board of Podiatric Medicine, the Board of Psychology, the Dental Board of California, the Dental Hygiene Board of California, the Osteopathic Medical Board of California, the State Board of Chiropractic Examiners, the Board of Registered Nursing, the Board of Vocational Nursing and Psychiatric Technicians of the State of California, the State Board of Optometry, the Veterinary Medical Board, the Board of Behavioral Sciences, the Physical Therapy Board of California, the California State Board of Pharmacy, the Speech-Language Pathology and Audiology and Hearing Aid Dispensers Board, the California Board of Occupational Therapy, the Acupuncture Board, and the Physician Assistant Board shall each separately create and maintain a central file of the names of all persons who hold a license, certificate, or similar authority from that board. Each central file shall be created and maintained to provide an individual historical record for each licensee with respect to the following information:

(1) Any conviction of a crime in this or any other state that constitutes unprofessional conduct pursuant to the reporting requirements of Section 803."

Also, please, read the Business and Professions Code Section 801.01, "The Legislature finds and declares that the filing of reports with the applicable state agencies required under this section is essential for the protection of the public. It is the intent of the Legislature that the reporting requirements set forth in this section be interpreted broadly in order to expand reporting obligations."

Please, take a Judicial Notice that, after the incident with the Patient Mr. X., Alameda Health System didn't report me to the appropriate Board after the patient's death. It means that I didn't conduct medical negligence towards Patient X despite the patient passed away.

**28. A good August 21, 2013 Letter of Reference from the AHS's Assistant Manager Mr. Robbie Masangkay.** Moreover, after the incident with the Patient Mr. X. that occurred in July 2013, the Alameda Health System (Assistant Manager of the Step Down Unit Mr. Robbie

Complaint for Damages.

1  Masangkay, Registered Nurse) gave me a good Letter of Reference on August 21, 2013, please,

2  see (**ER 07414 Vol. 3, page 581**), "August 21, 2013.

3        To whom it may concern.

4        I would like to recommend Ms. Tatyana Drevaleva to a position she is applying for. She

5  is currently our telemetry monitor technician that helps monitor 2 different nursing units. She is a

6  very hard working and dedicated staff and an important part of our team. She pays attention to

7  great detail and always makes certain that all our telemetry monitored patients are doing okay.

8  She immediately notifies the appropriate channels as situations arise. All I can say is that she will

9  be an asset wherever she may go….

10        Robbie Masangkay

11        Assistant Nurse Manager."

12

13        **29. My June-July 2013 verbal conversations with Mr. Clerve.** In June-July 2013, I

14  approached Manager Mr. Clerve multiple times, and I asked him questions about unpaid both

15  overtime and shift differentials, the denial of my affiliation to the Union, missed 10 and 15

16  minute breaks, and I asked him to transfer me to a full time job because I was actually working

17  full time. Mr. Clerve promised to think about it but nothing changed.

18

19        **30. My August 25, 2013 conversation with Harding.** On August 25, 2013, I approached

20  a newly appointed Director of Step Down Unit Mr. Gilbert Harding, and I asked him questions

21  about unpaid both overtime and shift differentials, the denial of my affiliation to the Union,

22  missed 10 and 15 minute breaks, and I asked him to transfer me to a full time job because I was

23  actually working full time. Mr. Harding promised to think about it but nothing changed.

24

25        **31. My September 05, 2013 letter to Harding.** On September 05, 2013, I emailed a

26  letter to Mr. Harding (**ER Vol. 1, pages 16-20**) where I wrote,

27               "To: Mr. Gilbert Harding,

28               Director of Step Down Unit

Complaint for Damages.

At Alameda Health System

From Monitor Technician

Tatyana Drevaleva.

September 5, 2013.

Mr. Harding,

I approached you a few days ago, and I shared some of the issues with you.

Here are these issues:

1) I was hired for 32 hours a week that is considered a Part time status at Alameda Health System. However, for over 3 months I've been working for 36 hours a week that is considered a Full time status at Step Down Unit. Despite that, I am still considered a Part time employee. I am overpaying for my health benefits, and I am not getting my retirement.

Here is this policy of Alameda Health System (you can read it in the attached document "Alameda County Medical Center, Human Resources, Policy and Procedure Manual" that I downloaded from the web-site of Alameda Health System):

The Twelve (12) Hour Shift – Twelve hour shifts for eligible nursing department employees may be implemented at the discretion of the department head. Full-time participating staff will work three twelve hour shifts for a total of 36 hours in a workweek and will be compensated with pay and benefits equivalent to that of an employee working full-time (40 hours) in a workweek.

According to the contract between SEIU and Alameda Health System, if I work 36 hours a week, I am entitled to be granted benefits equivalent to that of an employee working full-time (you can find this policy in the attached document "Memorandum of Understanding between SEIU local 1021 – general chapter and the Alameda County Medical Center, January 1, 2012 to March 31, 2014", page 15):

Complaint for Damages.

1   Full-time participating staff will work three (3) twelve (12) hour

2   shifts (36 hours) in a work week and be compensated for 36 hours per

3   week and be granted benefits equivalent to that of an employee working

4   full-time (40 hours) in a work week. Vacation, educational leave, holiday

5   and sick leave accruals will be equivalent to those for full-time employees.

6   Because I work for 36 hours a week, I am requesting to transfer me to a Full time

7   employee status.

8   You notified me that there was a job opening of a Monitor Technician Full Time

9   on the web-site of Alameda Health System, and you encouraged me to apply for this

10   position. However, this position does not exist on the web-site of Alameda Health

11   System. Regardless if this position exists or not, I am requesting a Full Time status

12   because I've been actually working full time (thirty six hours a week) for several months.

13   I am requesting to compensate me with benefits for all time when I have worked for 36

14   hours a week.

15   2)  I was hired for 8 hour shifts. For 1,5 months, I was scheduled for 8 hour shifts.

16   Afterwards, I was scheduled for 12 hour shifts, and I have worked for 12 hour shifts for

17   3,5 months. However, I have not been paid for overtime.

18   Here is the policy of Alameda Health System about an 8 hour shift (you can read

19   it in the attached document "Alameda County Medical Center, Human Resources, Policy

20   and Procedure Manual" that I downloaded from the web-site of Alameda Health System):

21   The standard workday begins at 12:01 a.m. and ends 24 hours

22   later. There are three primary work shifts in each workday; shift 1 (day),

23   shift 2 (evening) and shift 3 (night). A regularly scheduled, full-time shift

24   is normally 8 hours per day with ½ hour for lunch.

25   According to the Department of Industrial Relations of the State of California, I

26   am entitled to get paid overtime one and one-half times of my regular pay rate if I work

27   for more than 8 hours during my shift. You can find this policy at the web-site of the

28   Department of Industrial Relations of the State of California

Complaint for Damages.

http://www.dir.ca.gov/dlse/faq_overtime.htm:

Eight hours of labor constitutes a day's work, and employment beyond eight hours in any workday or more than six days in any workweek is permissible provided the employee is compensated for the overtime at not less than:

1. One and one-half times the employee's regular rate of pay for all hours worked in excess of eight hours up to and including 12 hours in any workday, and for the first eight hours worked on the seventh consecutive day of work in a workweek; and

2. Double the employee's regular rate of pay for all hours worked in excess of 12 hours in any workday and for all hours worked in excess of eight on the seventh consecutive day of work in a workweek.

3) I requested a copy of my schedule for April, May, and June. I got a copy of my schedule starting May 18th, 2013. I am still requesting a copy of my schedule starting April 1st and ending May 17th. I worked for four 8 hour shifts and one 12 hour shift during the week starting May 12th, 2013 and ending May 18th, 2013. I believe I was not paid for the shift that I worked on May 18th – I was paid for only four 8 hour shifts.

4) I participated in four RCA (root cause analysis) meetings. However, I did not know that I was supposed to clock in and clock out during the first RCA meeting. I did not clock in, and I did not clock out. I do not remember the exact day of my first RCA meeting. Could you, please, pay me for two hours of my participation in the first RCA meeting? I clocked in and I clocked out during all the following RCA meetings, and I got paid.

5) When I got my offer letter before being hired, I was promised the following shift differentials:

- evenings – 11%

- nights – 15.5%

- weekends – 5%.

Despite working evening shifts (meaning, from 3.00 PM to 11.00 PM), night shifts (meaning from 11.00 PM to 7.00 AM) and every other weekend, I have not been

Complaint for Damages.

paid the shift differentials that I was promised to be paid. My last pay stub shows only a 9% night shift differential, but this is much less of what I was promised. Some of my previous pay stubs do not show any shift differentials, some of my recent pay stubs show only 9% of the night shift differential.

According to the policy of Alameda Health System, employees should get their shift differentials (you can read it in the attached document "Alameda County Medical Center, Human Resources, Policy and Procedure Manual" that I downloaded from the web-site of Alameda Health System):

> There are special situations in which employees receive compensation in addition to their regular salaries. These premiums may include shift differential, on-call premiums, callback premiums, and holiday premiums.

According to the contract between SEIU and Alameda Health System, I am entitled to the promised shift differentials (you can find this policy in the attached document "Memorandum of Understanding between SEIU local 1021 – general chapter and the Alameda County Medical Center, January 1, 2012 to March 31, 2014", page 39):

> Employees who work a PM shift shall be paid a differential of eleven percent (11 %) calculated on their base pay.

> Employees who work a night shift shall be paid a differential of fifteen and one half percent (15.5%) calculated on their base pay.

6) When I work with Charge Nurse Nidia, I get my break and meal time completely (30 minutes and 45 minutes for a 12 hour shift). However, when I work with Charge Nurses Beverly, Kim, or Vera (when Ms. Kim and Ms. Vera perform duties of a Charge Nurse), I do not get all appropriate break time. I get only 30 minute and another 30 minute breaks.

According to the policy of Alameda Health System, employees who work for 8 hour shifts are entitled to have two paid 15 minute breaks and 1 unpaid 30 minute break (you can read it in the attached document "Alameda County Medical Center, Human

Complaint for Damages.

Resources, Policy and Procedure Manual" that I downloaded from the web-site of Alameda Health System):

> During each work period of eight working hours, full-time non-exempt employees are provided with two 15-minute paid rest periods and either one 30-minute or one hour unpaid meal period.

According to the contract between SEIU and Alameda Health System, if I work 12 hour shifts, I am entitled to get three paid 15 minute breaks and one unpaid 30 minute break (you can find this policy in the attached document "Memorandum of Understanding between SEIU local 1021 – general chapter and the Alameda County Medical Center, January 1, 2012 to March 31, 2014", page 16):

> Participating staff will receive three (3) fifteen (15) minute paid breaks and one (1) thirty (30) minute unpaid meal break.

According to the policy of Alameda Health System, I am even entitled to get 10 minute breaks every hour because I am observing video display screens for two consecutive hours and more.

> Employees using video display screens 2 consecutive hours or more are entitled to a 10-minute break every hour.

However, no one Charge Nurse gives me these breaks.

7) When I was hired by Alameda Health System, I signed a paper that I agree to be represented by the Union. After I started working, I was informed that my position of a Monitor Technician is not represented by the Union. I did not understand this statement because I had already signed a paper at Human Resources that I agree to be represented by the Union. Now, I am not paid Union fees. Could you, please, clarify this situation?

8) Now, I am a student of Peralta Colleges. My morning classes are on Monday, Tuesday, Wednesday, and Thursday. I also have an evening class on Tuesday at 6.00 PM. I am asking you, please, to make a fixed schedule for me because I am attending school. Please, schedule me every weekend (Saturday and Sunday) and please, schedule me every Thursday. Please, do not schedule me on Tuesday. This week, I missed my

Complaint for Damages.

1    Physiology lab class that was on Tuesday night because I had not been able to exchange

2    my shift with my co-workers.

3    9)  I am asking Alameda Health System to assist me paying for my college.

4    10) I am asking Alameda Health System to provide me with paid educational leave when

5    necessary.

6    According to the contract between SEIU and Alameda Health System, I am

7    entitled to an educational leave (you can find this policy in the attached document

8    "Memorandum of Understanding between SEIU local 1021 – general chapter and the

9    Alameda County Medical Center, January 1, 2012 to March 31, 2014" that I downloaded

10   from the web-site of Alameda Health System):

11   Full-time participating staff will work three (3) twelve (12) hour shifts (36

12   hours) in a work week and be compensated for 36 hours per week and be

13   granted benefits equivalent to that of an employee working full-time (40

14   hours) in a work week. Vacation, educational leave, holiday and sick leave

15   accruals will be equivalent to those for full-time employees.

16   Mr. Harding, please, provide me with a written answer on all these issues.

17   Thank you,

18   Respectfully,

19   Tatyana Drevaleva,

20   Alameda Health System,

21   Monitor Technician."

22

23   32. **The September 07, 2013 Termination Letter.** On September 07, 2013 that was in

24   two days after sending my September 05, 2013 letter to Mr. Harding, I came to work at

25   approximately 7:00 PM to work my night shift. From 7:00 PM until 7:20 PM, I was speaking to

26   my co-worker Ms. Doniea Lawson, and I was accepting the report about existing Telemetry

27   patients.

28

Complaint for Damages.

At 7:20 PM, Mr. Harding invited me to come to his Office. When I came to his Office, I saw AHS's Labor Analyst Mr. Adam Cole whom I had never seen before. Mr. Harding gave me a Termination Letter and informed me that I was fired. The Termination Letter said (**ER Vol. 1, page 34**),

"Alameda Health System...

September 7, 2013

Tatyana Drevaleva

3133 Beaumont

Oakland, CA

94602


Dear Ms. Drevaleva

This letter constitutes notice that you are being released from your employment as a Monitor Technician effective September 7, 2013. This action is being taken due to the discrepancies between acceptable employment standards and those you exhibited during your employment with us.

Should you have questions or concerns, please contact Labor Analyst Adam Cole at 510-535-7604.

    Sincerely,

    _____[Original signature]_____

    Gilbert Harding

    Director SDU

      cc. Labor Relations

      Employee file

      Personnel file."

Please, notice that the September 07, 2013 Termination Letter didn't explain the nature of the alleged "discrepancies" between acceptable employment standards and those I allegedly exhibited during my employment with the AHS. On September 07, 2013, I asked both Harding

Complaint for Damages.

and Cole to give me examples of these alleged "discrepancies." Harding's exact answer was, "we are not talking about it right now." It was obvious that AHS used pretext in its September 07, 2013 Termination Letter.

I am repeating that during my employment with the AHS I didn't have a verbal warning, I was not written up, and I was not subjected to a progressive discipline.

33. Prior to receiving the Termination Letter, I didn't receive a Notice, and I was not given an opportunity to be heard. Moreover, the September 07, 2013 process of the termination of my employment from the Alameda Health System violated the Memorandum of Understanding between SEIU local 1021 – general chapter and the Alameda County Medical Center, January 1, 2012 to March 31, 2014, ARTICLE 30. DISCPLINARY ACTION/NOTICE OF TERMINATION/PERSONNEL FILES (**ER 07414 Vol. 3, pages 522-524**), "**Section 30.1. Disciplinary Action**.

> 400. ACMC agrees to the principles of progressive discipline, where appropriate, and to due process as set forth in this Section. It is the intent that disciplinary action be corrective in nature and will only be administered for just cause.

> 401. **Counseling.** If an employee's performance or conduct is unsatisfactory, his/her supervisor may issue an informal verbal or written counseling. Counselings should address performance or conduct which, if not improved, may result in formal disciplinary action. Documentation, if any, of such counseling shall be given to the employee at the time of the counseling, or soon thereafter. A written record of a counseling will not be placed in the employee's personnel file, unless it results in subsequent disciplinary action. Because a counseling is not grievable, an employee may submit a written rebuttal.

> 402. **Written Reprimand/Warning.** A written reprimand/warning may be prepared by the supervisor and will be placed in the employee's personnel file.

> 403. **Recommended Suspensions And Terminations.** A recommended suspension/termination must be served on the employee in person or mailed. The notice should include:

Complaint for Damages.

A. A statement of the nature of the disciplinary action.

B. A statement of the cause of the action.

C. A statement in ordinary and concise language of the act or omission upon which the action is based.

D. A statement of the employee's right to respond either orally at a meeting requested by the employee, or in writing and timeframes for responding.

404. **Notice Of Termination.** In the event of termination of an employee subject to this Memorandum of Understanding for a cause other than intoxication on the job, gross insubordination, dishonesty, or conviction of a felony which relates to the employee's job, the Department Head or his/her designated agent shall give to such employee a written notice of termination no less than ten (10) working days prior to the effective date of said termination. In the event, however, that such employee is not on the job on the date he/she would be entitled to such notice, it shall be mailed to him/her on such date. Time spent on the job during such ten (10) day notice period by a probationary employee shall not be counted toward completion of the probationary period. ACMC agrees to furnish a copy of any such notice to the Union, unless the employee requests otherwise, but failure to receive such notice shall not invalidate such termination.

405. **Skelly Hearings.**

ACMC and SEIU will jointly agree to a third party neutral to attend each Skelly hearing and give a non-binding, verbal advisory opinion assisting the parties in resolving disciplinary cases. The opinion will not be used by the parties as a precedent or would be admissible in any subsequent except a Step 3 Hearing specific to that matter. The parties will use the State Mediation Service or the Federal Mediation and Conciliation Service should the State not be able to handle the volume or decline for any other reason. The trial period will last for six months from the date of the first hearing with the third party neutral. The rest of the Skelly process will remain the same with the exception of having only one Skelly officer at each hearing.

Complaint for Damages.

The Union and ACMC staff will meet periodically to jointly schedule hearings in advance. Scheduling will be determined by the Union's reasonable estimate of the amount of time it will take to investigate and prepare their case. Cancellations will only be by mutual consent unless there are emergency circumstances beyond either the Union's or the employee's control. The Skelly officer will make the final determination if a hearing should be rescheduled because of an emergency circumstance or order an alternate remedy. The Union will make reasonable, timely requests for information and ACMC will comply in a reasonable, timely manner.

If, at the end of six months there is no agreement to continue the practice, the parties will revert to the original process (including number of Skelly officers) in effect on the date this agreement is signed.

The Union or the employee shall have ten (10) days after receipt of the written Skelly decision in which to submit a written appeal of the discipline. Any appeal shall be pursued under Article 31, Grievance Procedure, by filing a grievance at the Step 3 level (CEO or designee).

406. **Appeal Of Skelly Decision.** The Union or the employee shall have ten (10) days after receipt of the written Skelly decision in which to submit a written appeal of the discipline. Any appeal shall be pursued under Article 31, Grievance Procedure, by filing a grievance at the Step 3 level (CEO or designee).

407. **Weingarten Rights.**

A. Rights Described. ACMC shall permit employees to be represented during investigatory meetings consistent with the principles established by the United States Supreme Court in the matter *Weingarten vs. NLRB*, as modified by the courts and the NLRB.

B. Failure to Grant Weingarten Rights. If an employee is denied Weingarten Rights during an investigatory meeting, the Employer must hold an additional meeting in which the employee is provided such rights and no disciplinary action shall take place until after the meeting is held."

34. Also, the September 07, 2013 termination of my employment without the Due Process violated the Alameda County Medical Center Human Resources Policy and Procedure Manual, Section 3.23 (**ER 07414 Vol. 2, pages 434-435**),"**PROCEDURE** 1. Termination – Involuntary.

Department Manager

a. Obtains approval from the Director, Human Resources.

Exception: Temporary employees may be released by supervisors with written notice to the employees. When operations permit, two weeks written notice shall be given.

b. Discusses with the employee the facts leading up to termination.

c. Completes the Personnel Action Notice and employee's time sheet and forwards to Finance prior to, or the day of termination.

Payroll

d. Computes all pay due, prepare the final check, and forwards to Human Resources.

Department Manager

e. Gives the final paycheck to the employee."

**35. The Last Pay Check**. The AHS was supposed to give me my last pay check on the day of the termination of my employment which was September 07, 2013, see the Cal. Lab. Code §§ 201, 202, 203(a.)

Read Labor Code Section 201, "(a) If an employer discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately. An employer who lays off a group of employees by reason of the termination of seasonal employment in the curing, canning, or drying of any variety of perishable fruit, fish, or vegetables, shall be deemed to have made immediate payment when the wages of said employees are paid within a reasonable time as necessary for computation and payment thereof; provided, however, that the reasonable time

Complaint for Damages.

1    shall not exceed 72 hours, and further provided that payment shall be made by mail to any

2    employee who so requests and designates a mailing address therefor."

3          Read Labor Code Section 202, "(a) If an employee not having a written contract for a

4    definite period quits his or her employment, his or her wages shall become due and payable not

5    later than 72 hours thereafter, unless the employee has given 72 hours previous notice of his or

6    her intention to quit, in which case the employee is entitled to his or her wages at the time of

7    quitting. Notwithstanding any other law, an employee who quits without providing a 72-hour

8    notice shall be entitled to receive payment by mail if he or she so requests and designates a

9    mailing address. The date of the mailing shall constitute the date of payment for purposes of the

10   requirement to provide payment within 72 hours of the notice of quitting."

11         Read Labor Code Section 203, "(a) If an employer willfully fails to pay, without

12   abatement or reduction, in accordance with Sections 201, 201.3, 201.5, 201.6, 201.8, 201.9, 202,

13   and 205.5, any wages of an employee who is discharged or who quits, the wages of the employee

14   shall continue as a penalty from the due date thereof at the same rate until paid or until an action

15   therefor is commenced; but the wages shall not continue for more than 30 days. An employee

16   who secretes or absents themselves to avoid payment to them, or who refuses to receive the

17   payment when fully tendered to them, including any penalty then accrued under this section, is

18   not entitled to any benefit under this section for the time during which the employee so avoids

19   payment.

20         (b) Suit may be filed for these penalties at any time before the expiration of the statute of

21   limitations on an action for the wages from which the penalties arise.

22              (Amended by Stats. 2019, Ch. 700, Sec. 2.5. (SB 286) Effective January 1,

23         2020.)"

24         Read Labor Code Section 227.3, "Unless otherwise provided by a collective-bargaining

25   agreement, whenever a contract of employment or employer policy provides for paid vacations,

26   and an employee is terminated without having taken off his vested vacation time, all vested

27   vacation shall be paid to him as wages at his final rate in accordance with such contract of

28   employment or employer policy respecting eligibility or time served; provided, however, that an

Complaint for Damages.

1  employment contract or employer policy shall not provide for forfeiture of vested vacation time

2  upon termination. The Labor Commissioner or a designated representative, in the resolution of

3  any dispute with regard to vested vacation time, shall apply the principles of equity and fairness.

4             (Amended by Stats. 1976, Ch. 1041.)"

5        However, the AHS mailed me my last pay check only on October 04, 2013 (**ER 07414,**

6  **Vol. 3, pages 577-578.**)  The AHS never paid me for sending my last pay check late, and the

7  AHS never paid me my vested vacation time.

8

9        **36. My letters to Executives of AHS.** On September 08, 2013, I mailed my letters to

10  Executives of the AHS:

11             1)  To CEO of AHS Mr. Lassiter (**ER 17-16382, Vol. 2, pages 1373-1376**)

12             2)  To Director of Human Resources of AHS Ms. Louden-Corbett (**ER 17-16382,**

13                 **Vol. 2, pages 1377-1379.**)

14        Please, read the plain language of these letters (the texts of these letters are identical),

15        "Mr. Lassiter (or Ms. Louden-Corbett),

16        My name is Tatyana Drevaleva. I am a former Monitor Technician of Step Down Unit,

17  Highland Hospital, Alameda Health System. I am writing this letter to you to report

18  discrimination and retaliation that I suffered from Director of Step Down Unit Mr. Gilbert

19  Harding on September 7th, 2013 at 19.25 PM.

20        I was hired as a Monitor Technician Part time (8 hour shifts, 32 hours a week) on April

21  1st, 2013. While completing my training for six weeks, I worked day and evening 8 (eight) hour

22  shifts, 32 (thirty two) hours a week. Starting May 18th, 2013, I was scheduled for three 12

23  (twelve) hour shifts per week resulting in 36 (thirty six) hours per week which is considered a

24  full time employment at Step Down Unit. However, I remained a Part time employee. I overpaid

25  for my health insurance, and I was not getting my retirement. Also, I was not getting shift

26  differentials that I had been promised before getting hired. In my offer letter, Alameda Health

27  System listed the following shift differentials: evenings – 11%, nights – 15.5%, weekends – 5%.

28  After I started to work, I did not get any shift differentials at all. Later, I started to get a 9% night

Complaint for Damages.

shift differential. I did not get any weekend shift differentials, even though I worked every other weekend. Despite I worked for 12 hour shifts while being hired for 8 hour shifts, I never got overtime payments.

Initially, my Manager was Mr. Verrilien Clerve. I approached him probably in the middle of July, and I verbally expressed my concerns about not getting promised shift differentials, not getting overtime payment, not getting my retirement, and overpaying for my health insurance while working full time 36 hours a week. Mr. Clerve referred me to my recruiter Mr. Kevin Silvestre who was supposed to change my official status from a 8 hour shift employee to a 12 hour shift employee. However, nothing changed, and I got only 9% of a night shift differential while still not getting a weekend shift differential, both overtime payment and retirement, and overpaying for my health insurance.

In late August, I approached our new Director Mr. Gilbert Harding and verbally expressed concerns about the same issues. I gave Mr. Harding a copy of my offer letter with promised shift differentials and copies of all my pay stubs demonstrating what shift differentials I was actually getting. In approximately 10 days from that meeting, on September 5th 2013, I wrote a letter to Mr. Harding expressing these and other concerns such as:

1) Employee safety issue. According to the policy of Alameda Health System, employees who observe video display screens for more than two hours are entitled to get 10 minute breaks every hour. I was not getting these breaks at all

2) A concern about Union representation. When I was hired by Alameda Health System, I signed a letter that I agree to be represented by the Union. However, later I was told that my position of a Monitor Technician is not represented by the Union. I did not see Union dues on my pay stubs

3) I said to Mr. Harding that I had become a student of Peralta Colleges, and I asked him to make a fixed schedule for me to coordinate with my classes

4) I asked Alameda Health System to assist me in paying for my tuition

5) I notified Mr. Harding that I was not getting enough break time. Employees who work 12 hour shifts are entitled to get one unpaid 30 minute meal break and three

Complaint for Damages.

1    paid 15 minute breaks. With one Charge Nurse, I got all my breaks. With other

2    Charge Nurses, I got only a 30 minute meal break and two 15 minute breaks.

3         I sent this letter in email to Mr. Harding on September 5th, 2013. With this letter, I

4    attached policies of Alameda Health System and Memorandum of Understanding between SEIU

5    Local 1021 – General Chapter and the Alameda County Medical Center, January 1, 2012 to

6    March 31, 2014. I asked Mr. Harding to give me written answers on all my questions.

7         Instead of answering my questions, Mr. Harding terminated my employment two days

8    after I sent this letter to him. On September 7th, 2013, I came to work at 19.00 PM to do a night

9    shift. At 19.25 PM, Mr. Harding invited me to his office. He gave me a letter that stated that my

10   employment with Alameda Health System was terminated on September 7th, 2013. In this letter,

11   Mr. Harding wrote: "This action is being taken due to the discrepancies between acceptable

12   employment standards and those you exhibited during your employment with us." I was at a loss

13   because I did not understand what discrepancies Mr. Harding was talking about. For over five

14   months of working at Alameda Health System, I was not late even one time and I did not get any

15   verbal or written warning. I got a good Letter of Reference from Assistant Manager Mr.

16   Masangkay who said: "She is a very hard working and dedicated staff and an important part of

17   our team. She pays attention to great detail and always makes certain that all our telemetry

18   monitored patients are doing okay. She immediately notifies the appropriate channels as

19   situations arise. All I can say is that she will be an asset wherever she may go."

20        I asked Mr. Harding to give me examples of alleged discrepancies that he stated in his

21   termination letter. He did not give me any examples.

22        I believe I was discriminated and retaliated by Director Harding based on my national

23   origin (I am Russian), race (I am Caucasian), age (I am 46 yo), and health condition (recently, I

24   had a surgery, and I provided Mr. Harding with a document from my doctor). My co-worker Ms.

25   Doniea Lawson who serves as a Monitor Technician at Step Down Unit said to me that she had

26   approached Mr. Harding and she expressed verbal concerns about not getting promised shift

27   differentials. However, Mr. Harding fired me and did not fire Ms. Lawson. Ms. Lawson is an

28

Complaint for Damages.

African-American young lady (her age is below 30 yo). Mr. Harding belongs himself to the African-American race.

I am reporting you this incident because now I am suffering from discrimination and retaliation committed by Mr. Harding. His behavior is unacceptable to the mission, vision, and core values of Alameda Health System which is going to become an employer of choice in Alameda County. I am suffering from a job loss, a loss of my health insurance (I need to go to a doctor after my surgery), money loss, anxiety and depression. I was proud to serve residents of Alameda County observing cardiac monitors and saving people's lives. With an adverse Mr. Harding's action, I lost a chance to develop professionally, and I lost faith in myself because my employer did not appreciate all hard work that I did for patients.

I am asking you to assist me in this matter. You can reach me sending a letter to my home address or my email address.

My home address is:

Tatyana Drevaleva

3133 Beaumont Ave.,

Oakland, CA,

94602

My email address is tdrevaleva@gmail.com

My cell phone number is 916-730-7698.

Please, give me your response in writing.

Thank you for your cooperation,

Respectfully,

Tatyana Drevaleva."

I never heard back from both Executives. I was not reinstated back to work at AHS. Please, notice that Mr. Lassiter also belongs to the African-American race as Mr. Harding.

Complaint for Damages.

37. **The AHS discriminated me against my race (Caucasian) because Mr. Gilbert Harding who is an African-American didn't fire my co-worker Ms. Doniea Lawson who is also an African-American after Ms. Lawson had asked Mr. Harding the same questions about unpaid both overtime and shift differentials, the denial of Ms. Lawson's affiliation to the Union, and missed breaks**. Mr. Harding who is an African-American discriminated me against my race in violation of both Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981 because Mr. Harding who is an African-American didn't fire my co-worker Ms. Doniea Lawson who is also an African-American after Ms. Lawson asked Mr. Harding ine same questions about unpaid both overtime and shift differentials, the denial of Ms. Lawson's affiliation to the Union, and missed breaks.

38. **The AHS discriminated me against my Russian Origin because, before firing me, Mr. Harding also fired another Monitor Technician Ms. Svetlana Muzychenko who had a Russian origin. Mr. Harding fired Ms. Muzychenko without previously giving her a Notice and an opportunity to respond**. In approximately July-August 2013, the AHS hired another Monitor Technician Ms. Svetlana Muzychenko who had a Russian origin. However, in approximately September 2013, Mr. Gilbert Harding fired Ms. Muzychenko without giving her a Notice and an opportunity to respond.

39. **My Unemployment Insurance benefits**. After being fired from the AHS, I was receiving my Unemployment Insurance benefits (**ER 07414 Vol. 3, page 583**), and the AHS stated the reason of the termination of my employment as "Probationary Release" (**ER 07414 Vol. 3, page 582**.) Please, notice that the AHS never stated to the Employment Development Department that the reason of the termination of my employment was medical negligence towards the patient and/or a poor professional performance.

40. **My Personnel File**. After being terminated from the AHS, I obtained a Personnel File (**ER 17-16382, Vol. 1, page 1010**) where the AHS wrote that the reason of the termination

Complaint for Damages.

1   of my employment was a "Probationary Release." However, the AHS marked me as "Ineligible

2   for rehire" without explaining the reason for this decision. Please, notice that in the Personnel

3   File the AHS didn't write that I had been fired for medical negligence towards the patient and/or

4   for poor professional performance.

5

6   **41. My subsequent employment offers after being terminated from the AHS**. In

7   2013, after being terminated from the AHS, I received an employment offer from the H.E.L.P.

8   staffing agency for the position of an Electrocardiography Technician at the Children's Hospital

9   in Oakland, CA. It would have never happened if I were fired from the AHS for medical

10  negligence towards the patient and/or for poor professional performance.

11  In 2017, I received a full time job offer at the Raymond G. Murphy VAMC in

12  Albuquerque, NM (**ER 07414 Vol. 3, page 684**.) It would have never happened if I were fired

13  from the AHS for medical negligence towards the patient and/or for poor professional

14  performance.

15

16  **42. The September 23, 2013 letter to me from Director of Labor Relations of the**

17  **Alameda Health System Mr. Dick Dodson**.

18  On September 23, 2013, Director of Labor Relations of the Alameda Health System Mr.

19  Dick Dodson sent me a letter (**ER 07414 Vol. 3, pages 606-611**) that was the AHS's response to

20  my September 05, 2013 letter to Mr. Harding. Please, notice that on September 07, 2013 the

21  AHS fired me for asking questions about unpaid both overtime and shift differentials, the denial

22  of my affiliation to the Union, missed 10 and 15 minute breaks, for asking to transfer me to a full

23  time job, and in as act of discrimination against my both Russian origin and race, and the AHS

24  responded to my September 05, 2013 letter to Mr. Harding only on September 23, 2013 that was

25  after firing me.

26  Please, read the September 23, 2013 letter of Mr. Dodson (**ER 07414 Vol. 3, pages 606-**

27  **611**),

28  "Alameda Health System

Complaint for Damages.

September 23, 2013

Tatyana Drevaleva

3133 Beaumont Ave.

Oakland, CA, 94602


Dear Ms. Drevaleva,

On September 5th, 2013, you submitted a letter listing 10 different concerns you had about your job as a monitor technician to your manager, Gilbert Harding. Below, I have included a copy of your concerns with responses following thereafter.

1) I was hired for 32 hours a week that is considered a Part time status at Alameda Health System. However, for over 3 months I've been working for 36 hours a week that is considered a Full time status at Step Down Unit. Despite that, I am still considered a Part time employee. I am overpaying for my health benefits, and I am not getting my retirement.

Here is this policy of Alameda Health System (you can read it in the attached document "Alameda County Medical Center, Human Resources, Policy and Procedure Manual" that I downloaded from the web-site of Alameda Health System):

The Twelve (12) Hour Shift – Twelve hour shifts for eligible nursing department employees may be implemented at the discretion of the department head. Full-time participating staff will work three twelve hour shifts for a total of 36 hours in a workweek and will be compensated with pay and benefits equivalent to that of an employee working full-time (40 hours) in a workweek.

According to the contract between SEIU and Alameda Health System, if I work 36 hours a week, I am entitled to be granted benefits equivalent to that of an employee working full-time (you can find this policy in the attached document "Memorandum of Understanding between SEIU local 1021 – general chapter and the Alameda County Medical Center, January 1, 2012 to March 31, 2014", page 15):

Complaint for Damages.

Full-time participating staff will work three (3) twelve (12) hour shifts (36 hours) in a work week and be compensated for 36 hours per week and be granted benefits equivalent to that of an employee working full-time (40 hours) in a work week. Vacation, educational leave, holiday and sick leave accruals will be equivalent to those for full-time employees.

Because I work for 36 hours a week, I am requesting to transfer me to a Full time employee status.

You notified me that there was a job opening of a Monitor Technician Full Time on the web-site of Alameda Health System, and you encouraged me to apply for this position. However, this position does not exist on the web-site of Alameda Health System. Regardless if this position exists or not, I am requesting a Full Time status because I've been actually working full time (thirty six hours a week) for several months. I am requesting to compensate me with benefits for all time when I have worked for 36 hours a week.

**"Full time status is granted when there is a full time position available. Employees who work extra shifts are not automatically made full time unless there is a union contract clause governing such changes in status. The only such clause is in the SEIU General Chapter MOU and requires a six month look back period. While you were employed with AHS you were not represented by SEIU so this clause did not apply to you. Further, if you had been an SEIU member while still employed with AHS, you had not yet worked for the Health System for six months and would not have met the necessary amount of time stipulated by the clause,"**

2) I was hired for 8 hour shifts. For 1,5 months, I was scheduled for 8 hour shifts. Afterwards, I was scheduled for 12 hour shifts, and I have worked for 12 hour shifts for 3,5 months. However, I have not been paid for overtime.

Complaint for Damages.

Here is the policy of Alameda Health System about an 8 hour shift (you can read it in the attached document "Alameda County Medical Center, Human Resources, Policy and Procedure Manual" that I downloaded from the web-site of Alameda Health System):

The standard workday begins at 12:01 a.m. and ends 24 hours later. There are three primary work shifts in each workday; shift 1 (day), shift 2 (evening) and shift 3 (night). A regularly scheduled, full-time shift is normally 8 hours per day with ½ hour for lunch.

According to the Department of Industrial Relations of the State of California, I am entitled to get paid overtime one and one-half times of my regular pay rate if I work for more than 8 hours during my shift. You can find this policy at the web-site of the Department of Industrial Relations of the State of California

http://www.dir.ca.gov/dlse/faq_overtime.htm:

Eight hours of labor constitutes a day's work, and employment beyond eight hours in any workday or more than six days in any workweek is permissible provided the employee is compensated for the overtime at not less than:

1. One and one-half times the employee's regular rate of pay for all hours worked in excess of eight hours up to and including 12 hours in any workday, and for the first eight hours worked on the seventh consecutive day of work in a workweek; and

2. Double the employee's regular rate of pay for all hours worked in excess of 12 hours in any workday and for all hours worked in excess of eight on the seventh consecutive day of work in a workweek.

**As a public employer, this state provision does not apply to AHS (see IWC 4-2001). We are obligated by law to pay time and a half only after 40 hours worked in any one week. The policy which you cited, HR policy 2.10 – Wage and Hour Terms and Definitions was out of date. The current version is available on our intranet and reads (which was last revised June, 2011):**

Complaint for Damages.

Standard Workday.

The standard workday begins at 12.01 a.m. and ends 24 hours later. A regularly scheduled, full-time shift includes unpaid ½ hour for lunch. The calendar day in which the work begins determines the day for time reporting purposes. (For example, for an employee who works a regularly scheduled shift beginning at 11.00 p.m. on Thursday and ending at 7.00 a.m. on Friday, all 8 hours are reported on Thursday).

**It does not stipulate that a work day is 8 hours as we employ many employees on a 12 hour shift schedule and our past practice establishes that these employees do not receive overtime unless they cross the 40 hours worked per week threshold. Again, these employees do not receive daily overtime for working more than 8 hours**.

3) I requested a copy of my schedule for April, May, and June. I got a copy of my schedule starting May 18th, 2013. I am still requesting a copy of my schedule starting April 1st and ending May 17th. I worked for four 8 hour shifts and one 12 hour shift during the week starting May 12th, 2013 and ending May 18th, 2013. I believe I was not paid for the shift that I worked on May 18th – I was paid for only four 8 hour shifts.

**A record from payroll for the week of May 18th as is your badge swipe record. As you can see, for that week you were paid 40 hours of regular time and 4.25 hours as overtime as you had overcome the 40 hour a week limit for straight time.**

4) I participated in four RCA (root cause analysis) meetings. However, I did not know that I was supposed to clock in and clock out during the first RCA meeting. I did not clock in, and I did not clock out. I do not remember the exact day of my first RCA meeting. Could you, please, pay me for two hours of my participation in the first RCA meeting? I clocked in and I clocked out during all the following RCA meetings, and I got paid.

Complaint for Damages.

**You will be paid for 2 hours for that time worked.**

5) When I got my offer letter before being hired, I was promised the following shift differentials:

> - evenings – 11%
>
> - nights – 15.5%
>
> - weekends – 5%.

Despite working evening shifts (meaning, from 3.00 PM to 11.00 PM), night shifts (meaning from 11.00 PM to 7.00 AM) and every other weekend, I have not been paid the shift differentials that I was promised to be paid. My last pay stub shows only a 9% night shift differential, but this is much less of what I was promised. Some of my previous pay stubs do not show any shift differentials, some of my recent pay stubs show only 9% of the night shift differential.

According to the policy of Alameda Health System, employees should get their shift differentials (you can read it in the attached document "Alameda County Medical Center, Human Resources, Policy and Procedure Manual" that I downloaded from the web-site of Alameda Health System):

> There are special situations in which employees receive compensation in addition to their regular salaries. These premiums may include shift differential, on-call premiums, callback premiums, and holiday premiums.

According to the contract between SEIU and Alameda Health System, I am entitled to the promised shift differentials (you can find this policy in the attached document "Memorandum of Understanding between SEIU local 1021 – general chapter and the Alameda County Medical Center, January 1, 2012 to March 31, 2014", page 39):

> Employees who work a PM shift shall be paid a differential of eleven percent (11 %) calculated on their base pay.

Complaint for Damages.

Employees who work a night shift shall be paid a differential of fifteen and one half percent (15.5%) calculated on their base pay.

**As an unrepresented employee, the SEIU MOU did not apply to you. Your offer letter does not stipulate that you would receive the shift differentials that you listed.**

6) When I work with Charge Nurse Nidia, I get my break and meal time completely (30 minutes and 45 minutes for a 12 hour shift). However, when I work with Charge Nurses Beverly, Kim, or Vera (when Ms. Kim and Ms. Vera perform duties of a Charge Nurse), I do not get all appropriate break time. I get only 30 minute and another 30 minute breaks.

According to the policy of Alameda Health System, employees who work for 8 hour shifts are entitled to have two paid 15 minute breaks and 1 unpaid 30 minute break (you can read it in the attached document "Alameda County Medical Center, Human Resources, Policy and Procedure Manual" that I downloaded from the web-site of Alameda Health System):

During each work period of eight working hours, full-time non-exempt employees are provided with two 15-minute paid rest periods and either one 30-minute or one hour unpaid meal period.

According to the contract between SEIU and Alameda Health System, if I work 12 hour shifts, I am entitled to get three paid 15 minute breaks and one unpaid 30 minute break (you can find this policy in the attached document "Memorandum of Understanding between SEIU local 1021 – general chapter and the Alameda County Medical Center, January 1, 2012 to March 31, 2014", page 16):

Participating staff will receive three (3) fifteen (15) minute paid breaks and one (1) thirty (30) minute unpaid meal break.

Complaint for Damages.

1    According to the policy of Alameda Health System, I am even entitled to get 10

2  minute breaks every hour because I am observing video display screens for two

3  consecutive hours and more.

4      Employees using video display screens 2 consecutive hours or more are

5      entitled to a 10-minute break every hour.

6    However, no one Charge Nurse gives me these breaks.

7

8  **As stated before, the SEIU MOU did not apply to you as an unrepresented**

9  **employee. Frequently missed breaks are an issue that should have been addressed to your**

10  **manager as son as possible. You are entitled to two fifteen minute breaks and a 30 minute**

11  **lunch break. If you have instances of missed lunch breaks, those should be substantiated**

12  **and reported so that you can be compensated. Missed 15 minute breaks, however, are**

13  **already compensated.**

14

15  7) When I was hired by Alameda Health System, I signed a paper that I agree to be

16    represented by the Union. After I started working, I was informed that my position of a

17    Monitor Technician is not represented by the Union. I did not understand this statement

18    because I had already signed a paper at Human Resources that I agree to be represented

19    by the Union. Now, I am not paid Union fees. Could you, please, clarify this situation?

20

21  **You were not a member of SEIU. When you worked for AHS your title was**

22  **unrepresented. To become represented it needed to be claimed by SEIU, and, while SEIU**

23  **has recently done so, we are still in the negotiating process.**

24

25  8) Now, I am a student of Peralta Colleges. My morning classes are on Monday, Tuesday,

26    Wednesday, and Thursday. I also have an evening class on Tuesday at 6.00 PM. I am

27    asking you, please, to make a fixed schedule for me because I am attending school.

28    Please, schedule me every weekend (Saturday and Sunday) and please, schedule me

Complaint for Damages.

1   every Thursday. Please, do not schedule me on Tuesday. This week, I missed my

2   Physiology lab class that was on Tuesday night because I had not been able to exchange

3   my shift with my co-workers.

4   9)  I am asking Alameda Health System to assist me paying for my college.

5   10) I am asking Alameda Health System to provide me with paid educational leave when

6   necessary.

7   According to the contract between SEIU and Alameda Health System, I am

8   entitled to an educational leave (you can find this policy in the attached document

9   "Memorandum of Understanding between SEIU local 1021 – general chapter and the

10   Alameda County Medical Center, January 1, 2012 to March 31, 2014" that I downloaded

11   from the web-site of Alameda Health System):

12   Full-time participating staff will work three (3) twelve (12) hour shifts (36

13   hours) in a work week and be compensated for 36 hours per week and be

14   granted benefits equivalent to that of an employee working full-time (40

15   hours) in a work week. Vacation, educational leave, holiday and sick leave

16   accruals will be equivalent to those for full-time employees.

17

18   **Given your recent release from employment with AHS these final questions are**

19   **irrelevant. However, please be aware that education reimbursement would have required**

20   **approval from your manager prior to enrollment**.

21

22   It bears noting that the decision to release you from your employment had been made

23   prior to your submission of these concerns. Should you have any further concerns about the

24   answers provided here please contact me at 510-895-4205 or Labor Analyst Adam Cole at 510-

25   535-7604.

26   Thank you,

27   ____[original signature]_____

28   Dick Dodson

Complaint for Damages.

1    Director, Labor Relations."

2

3    43. Please, notice that the September 23, 2013 letter of Mr. Dodson stated that (**ER**

4    **07414 Vol. 3, page 611**) "the decision to release you from your employment had been made

5    prior to your submission of these concerns." However, before September 05 when I emailed my

6    letter to Mr. Harding, nobody ever notified me that the AHS had made a decision to terminate

7    my employment. Obviously, Mr. Dodson's statement in his September 23, 2013 letter that the

8    AHS made a decision to terminate my employment prior to submitting the September 05, 2013

9    letter to Mr. Harding was pretextual.

10

11   **44. My September 16, 2013 retaliation and unlawful termination claim, my wage**

12   **claim, amd my occupational safety claim to the Department of Industrial Relations (the**

13   **DIR), the Division of Labor Standards Enforcement (DLSE.)** On September 16, 2013, I

14   submitted my retaliation and unlawful termination claim, my wage claim, and my occupational

15   safety claim to the DIR/DLSE (**ER 07414 Vol. 1, page 129**), "On 09.05.2013, I sent a letter to

16   my Director Mr. Harding where I rose issues of employee safety (not getting breaks while

17   observing video display screens that are cardiac monitors) and not getting shift differentials and

18   overtime payment. On 09.07.2013, I was fired.

19       In the termination letter, my former employer wrote, "this action is being taken due to the

20   discrepancies between acceptable employment standards and those you exhibited during your

21   employment with us." However, the employer did not give me any examples of alleged

22   discrepancies.

23       My employer got my letter in the email on 09.05.2013."

24       Deputy of the Labor Commissioner Mr. Bobit Santos was assigned to investigate my

25   wage claim. Deputy of the Labor Commissioner Ms. Catherine Daly was assigned to investigate

26   my retaliation and unlawful termination claim.

27

28

Complaint for Damages.

**45. The California Labor Code, Section 98 that governed my wage claim after the termination of my emnployment from the Alameda Health System in 2013.** Pursuant to the California Labor Code Section 98(a), Deputy of the Labor Commissioner Mr. Bobit Santos had a mandatory obligation (the word "shall") to notify the Patties Tatyana Drevaleva and the Alameda Health System about whether or not the investigative hearing would be held, Please, read Labor Code Section 98, "(a) The Labor Commissioner is authorized to investigate employee complaints. The Labor Commissioner may provide for a hearing in any action to recover wages, penalties, and other demands for compensation, including liquidated damages if the complaint alleges payment of a wage less than the minimum wage fixed by an order of the Industrial Welfare Commission or by statute, properly before the division or the Labor Commissioner, including orders of the Industrial Welfare Commission, and shall determine all matters arising under his or her jurisdiction. The Labor Commissioner may also provide for a hearing to recover civil penalties due pursuant to Section 558 against any employer or other person acting on behalf of an employer, including, but not limited to, an individual liable pursuant to Section 558.1. It is within the jurisdiction of the Labor Commissioner to accept and determine claims from holders of payroll checks or payroll drafts returned unpaid because of insufficient funds, if, after a diligent search, the holder is unable to return the dishonored check or draft to the payee and recover the sums paid out. Within 30 days of the filing of the complaint, the Labor Commissioner shall notify the parties as to whether a hearing will be held, whether action will be taken in accordance with Section 98.3, or whether no further action will be taken on the complaint. If the determination is made by the Labor Commissioner to hold a hearing, the hearing shall be held within 90 days of the date of that determination. However, the Labor Commissioner may postpone or grant additional time before setting a hearing if the Labor Commissioner finds that it would lead to an equitable and just resolution of the dispute. A party who has received actual notice of a claim before the Labor Commissioner shall, while the matter is before the Labor Commissioner, notify the Labor Commissioner in writing of any change in that party's business or personal address within 10 days after the change in address occurs.

Complaint for Damages.

1    It is the intent of the Legislature that hearings held pursuant to this section be conducted

2    in an informal setting preserving the rights of the parties."

3

4    **46. The DIR's ruling on my wage claim**. However, after I filed my wage claim with the

5    Labor Commissioner on September 16, 2013, I never heard from Mr. Bobit Santos within 30

6    days from filing my wage claim, and Mr. Santos never notified me within 30 days whether or not

7    he would hold an investigative hearing regarding my wage claim.

8    47. On January 07, 2014 that was outside of the mandatory 30 day period that was

9    imposed by Labor Code Section 98(a), Mr. Bobit Santos issued a letter that denied my wage

10   claim for the following reasons (**ER 07414 Vol. 3, page 615**), "We have completed our

11   investigation of the complaint made by plaintiff shown above.

12   This is to advise you that no further action is contemplated by this office and we are

13   closing our file.

14   The Division does not have over claims for overtime, rest period premiums, differential

15   pay, or waiting time penalties for county employees. This case has been closed for lack of

16   jurisdiction. The plaintiff retains the right to pursue their claim through any other appropriate

17   forum.

18            Date: 1/7/2014

19            Bobit Santos

20            ____[signature made by a computer, not an original signature]____

21            Deputy Labor Commissioner

22            510-622-3275."

23   However, Mr. Santos didn't explain to me what "any other appropriate forum" means. He

24   never advised me about my right to file a lawsuit in a Court or to file an Appeal with the Director

25   of the Department of Industrial Relations.

26

27   **48. The California Labor Code Section 98.7 that governed my retaliation and**

28   **unlawful termination claim, the version of January 01, 2014**.

Complaint for Damages.

1    My retaliation and unlawful termination claim was governed by the California Labor

2    Code Section 98.7, see the version of January 01, 2014.

3    "**98.7**. (a) Any person who believes that he or she has been discharged or otherwise

4    discriminated against in violation of any law under the jurisdiction of the Labor Commissioner

5    may file a complaint with the division within six months after the occurrence of the violation.

6    The six-month period may be extended for good cause. The complaint shall be investigated by a

7    discrimination complaint investigator in accordance with this section. The Labor Commissioner

8    shall establish procedures for the investigation of discrimination complaints. A summary of the

9    procedures shall be provided to each complainant and respondent at the time of initial contact.

10    The Labor Commissioner shall inform complainants charging a violation of Section 6310 or

11    6311, at the time of initial contact, of his or her right to file a separate, concurrent complaint with

12    the United States Department of Labor within 30 days after the occurrence of the violation.

13    (b) Each complaint of unlawful discharge or discrimination shall be assigned to a

14    discrimination complaint investigator who shall prepare and submit a report to the Labor

15    Commissioner based on an investigation of the complaint. The Labor Commissioner may

16    designate the chief deputy or assistant Labor Commissioner or the chief counsel to receive and

17    review the reports. The investigation shall include, where appropriate, interviews with the

18    complainant, respondent, and any witnesses who may have information concerning the alleged

19    violation, and a review of any documents that may be relevant to the disposition of the

20    complaint. The identity of a witness shall remain confidential unless the identification of the

21    witness becomes necessary to proceed with the investigation or to prosecute an action to enforce

22    a determination. The investigation report submitted to the Labor Commissioner or designee shall

23    include the statements and documents obtained in the investigation, and the findings of the

24    investigator concerning whether a violation occurred. The Labor Commissioner may hold an

25    investigative hearing whenever the Labor Commissioner determines, after review of the

26    investigation report, that a hearing is necessary to fully establish the facts. In the hearing the

27    investigation report shall be made a part of the record and the complainant and respondent shall

28

Complaint for Damages.

1   have the opportunity to present further evidence. The Labor Commissioner shall issue, serve, and

2   enforce any necessary subpoenas.

3        (c) If the Labor Commissioner determines a violation has occurred, he or she shall notify

4   the complainant and respondent and direct the respondent to cease and desist from the violation

5   and take any action deemed necessary to remedy the violation, including, where appropriate,

6   rehiring or reinstatement, reimbursement of lost wages and interest thereon, payment of

7   reasonable attorney s fees associated with any hearing held by the Labor Commissioner in

8   investigating the complaint, and the posting of notices to employees. If the respondent does not

9   comply with the order within 10 working days following notification of the Labor Commissioner

10  s determination, the Labor Commissioner shall bring an action promptly in an appropriate court

11  against the respondent. If the Labor Commissioner fails to bring an action in court promptly, the

12  complainant may bring an action against the Labor Commissioner in any appropriate court for a

13  writ of mandate to compel the Labor Commissioner to bring an action in court against the

14  respondent. If the complainant prevails in his or her action for a writ, the court shall award the

15  complainant court costs and reasonable attorney s fees, notwithstanding any other law.

16  Regardless of any delay in bringing an action in court, the Labor Commissioner shall not be

17  divested of jurisdiction. In any action, the court may permit the claimant to intervene as a party

18  plaintiff to the action and shall have jurisdiction, for cause shown, to restrain the violation and to

19  order all appropriate relief. Appropriate relief includes, but is not limited to, rehiring or

20  reinstatement of the complainant, reimbursement of lost wages and interest thereon, and any

21  other compensation or equitable relief as is appropriate under the circumstances of the case. The

22  Labor Commissioner shall petition the court for appropriate temporary relief or restraining order

23  unless he or she determines good cause exists for not doing so.

24       (d) (1) If the Labor Commissioner determines no violation has occurred, he or she shall

25  notify the complainant and respondent and shall dismiss the complaint. The Labor Commissioner

26  may direct the complainant to pay reasonable attorney s fees associated with any hearing held by

27  the Labor Commissioner if the Labor Commissioner finds the complaint was frivolous,

28  unreasonable, groundless, and was brought in bad faith. The complainant may, after notification

Complaint for Damages.

of the Labor Commissioner s determination to dismiss a complaint, bring an action in an appropriate court, which shall have jurisdiction to determine whether a violation occurred, and if so, to restrain the violation and order all appropriate relief to remedy the violation. Appropriate relief includes, but is not limited to, rehiring or reinstatement of the complainant, reimbursement of lost wages and interest thereon, and other compensation or equitable relief as is appropriate under the circumstances of the case. When dismissing a complaint, the Labor Commissioner shall advise the complainant of his or her right to bring an action in an appropriate court if he or she disagrees with the determination of the Labor Commissioner, and in the case of an alleged violation of Section 6310 or 6311, to file a complaint against the state program with the United States Department of Labor.

(2) The filing of a timely complaint against the state program with the United States Department of Labor shall stay the Labor Commissioner s dismissal of the division complaint until the United States Secretary of Labor makes a determination regarding the alleged violation. Within 15 days of receipt of that determination, the Labor Commissioner shall notify the parties whether he or she will reopen the complaint filed with the division or whether he or she will reaffirm the dismissal.

(e) The Labor Commissioner shall notify the complainant and respondent of his or her determination under subdivision (c) or paragraph (1) of subdivision (d), not later than 60 days after the filing of the complaint. Determinations by the Labor Commissioner under subdivision (c) or (d) may be appealed by the complainant or respondent to the Director of Industrial Relations within 10 days following notification of the Labor Commissioner s determination. The appeal shall set forth specifically and in full detail the grounds upon which the appealing party considers the Labor Commissioner s determination to be unjust or unlawful, and every issue to be considered by the director. The director may consider any issue relating to the initial determination and may modify, affirm, or reverse the Labor Commissioner s determination. The director s determination shall be the determination of the Labor Commissioner. The director shall notify the complainant and respondent of his or her determination within 10 days of receipt of the appeal.

Complaint for Damages.

(f) The rights and remedies provided by this section do not preclude an employee from pursuing any other rights and remedies under any other law.

(g) In the enforcement of this section, there is no requirement that an individual exhaust administrative remedies or procedures.

(*Amended by Stats. 2013, Ch. 732, Sec. 3. Effective January 1, 2014.*)"

49. Please, take a Judicial Notice that the plain language of the Labor Code Section 98.7(b) that imposed a mandatory obligation on the Labor Commissioner (the word "shall") to investigate the complaint by doing all of the following, where appropriate:

1) To conduct interviews with the complainant Tatyana Drevaleva
2) To conduct interviews with the respondent the Alameda Health System
3) To conduct interviews with the witnesses who may have information concerning the alleged violation
4) To conduct a review of any documents that may be relevant to the disposition of the complaint,

50. Please, read the plain language of Labor Code Section 98.7(b), "The investigation shall include, where appropriate, interviews with the complainant, respondent, and any witnesses who may have information concerning the alleged violation, and a review of any documents that may be relevant to the disposition of the complaint."

51. Please, take a Judicial Notice that the plain language of Labor Code Section 98.8(e) imposed a mandatory obligation on the Labor Commissioner (the word "shall") to notify the complainant Tatyana Drevaleva and a respondent the Alameda Health System about the determination regarding my retaliation and unlawful termination claim within 60 (sixty) days from filing this claim, "(e) The Labor Commissioner shall notify the complainant and respondent of his or her determination under subdivision (c) or paragraph (1) of subdivision (d), not later than 60 days after the filing of the complaint."

52. I am reminding that I filed a retaliation and unlawful termination claim with the Labor Commissioner on September 16, 2013. However, I never received a Determination from

Complaint for Damages.

the Labor Commissioner regarding my retaliation and unlawful termination claim within 60 days from September 16, 2013.

**53. My stay in Russia from 2014 to 2016**. Because I lost my health insurance as a result of being fired from the AHS in 2013, and because I needed a gynecological surgery, I moved to Russia in January 2014 to March 2014 and again from April 2014 to August 2016. I notified Ms. Catherine Daly who was investigating my retaliation and unlawful termination claim that I would stay in Russia, and I asked to email me the correspondence.

**54. Ms. Daly's June 16, 2014 letter to me**. On June 16, 2014, while being in Russia, and way outside of the 60 day mandatory period of time that was imposed by labor Code Section 98.7(e), I received an email from Deputy Ms. Daly (**ER 07414, Vol. 3, pages 579-580**.) Read **page 579**, "Dear Ms. Dreveleva:

You need to rebut your former employer's response to your unlawful retaliation charge.

You argued Alameda Health System ("AHS") fired you for complaining about safety and compensation issues. On September 5, 2013, you emailed management to report AHS allegedly (1) compromised patient safety by failing to provide required breaks; and (2) never paid mandated overtime or a shift differential. Your September 5, 2013 email also raised Collective Bargaining Agreement ("CBA") rights. On September 7, 2013 —just two days later— AHS terminated you.

AHS admitted firing you but blamed its decision on your failure to meet "acceptable employment standards." Specifically, your negligence allegedly seriously harmed a patient. Moreover, it asserted you already knew you faced termination when you emailed your September 5, 2013 complaints. Therefore your emailed communication could not have triggered the termination. Finally, it explained why all your complaints lacked merit.

AHS provided the Division of Labor Standard Enforcement ("DLSE") with a legitimate, non-retaliatory reason for firing you. Therefore you must prove AHS's response "more likely than not" covers up retaliation or discrimination. This means showing AHS fired you because

1  you complained about illegal or unsafe working conditions. If you fail to show this pretext

2  (masking) you cannot establish AHS violated Labor Codes Sections 98.6 and 6310.

3      If you feel you have sufficient evidence to show AHS reasons are pretextual, please reply

4  by *July 18, 2014*. In your response include supporting documents and a witness list. Your

5  witness list needs to provide names, addresses, and telephone numbers or emails. Please add a

6  short statement about what the witness will say. Finally prepare a separate document listing the

7  adverse actions taken against you and place the events in date order. *If you do not respond by*

8  *July 18, 2014, I will assume you no longer wish to go forward with your case*.

9      Please include all disputed issues and supporting evidence you want us to consider. The

10  DLSE normally does not provide hearings in RCI matters.

11      If you have any further questions or concerns, you may call (415) 703-4841 or email

12  cdaly@dir.ca.gov

13              Sincerely,

14              _____[a computer signature]_____

15          Catherine S. Daly

16          Deputy Labor Commissioner

17          Retaliation Complaint Unit.”

18      Please, notice that the plain language of Ms. Daly's June 16, 2014 email accused me in

19  committing medical negligence towards the patient. However, please, notice that Ms. Daly never

20  provided me with the details about the allegation of the medical negligence towards the patient.

21  Also, Ms. Daly never told me who this alleged patient was and what wrong I did that was

22  considered as medical negligence towards the patient.

23

24      **55. My June 18, 2014 email to Ms. Daly**. On June 18, 2014, I sent a letter to Ms. Daly

25  (**ER 07414 Vol. 3, pages 585-595**), “Dear Ms. Daly!

26      Thank you for sending me a letter. I didn't know that Alameda Health System claims that

27  I was fired because “my negligence seriously harmed the patient”. I disagree with this

28  explanation, and I will give you the evidence.

Complaint for Damages.

Because of patient safety issues, you didn't specify what exactly patient was allegedly harmed because of my "negligence". I can only guess what patient it was. I will give you my explanation about what happened with that patient. I don't feel that I harmed that patient any possible way, and I will explain to you why.

I performed duties of a Monitor Technician observing cardiac monitors. Among other patients, I was observing the cardiac rhythm of patient X (this is a fake name). Initially, I observed Sinus Rhythm which is a norm for a cardiac rhythm. At about 4.00 AM, I heard a conversation between a nurse of patient X and a laboratory technician who had called to report a critical lab result that a level of Potassium in the blood of this patient was highly elevated. Soon after that, I heard how the nurse reported this result to a Charge nurse. Some time later, I observed how the nurse of patient X was standing next to my working place in a hallway and reporting to the Charge Nurse that the patient was irresponsive and didn't respond to touch and conversation. I was greatly surprised that the nurse was standing in a hallway, not in the patient's room, and she didn't assess the patient. In my opinion, she was moving very slowly, and she was not in hurry to go back to the patient's room. It was obvious that an irresponsive patient X was lying in his bed totally alone in his room without a nurse or any other medical worker who could have rendered medical assistance to that patient. At that particular time, there were changes that appeared on patient X's electrocardiogram. These changes were a shift from Normal Sinus Rhythm to monomorphic waves that reminded artifacts or Ventricular Tachycardia. I started to differentiate these waves. These waves had picks that perfectly marched out with the previous Sinus Rhythm. The form of these waves differed from the form of the waves of Ventricular Tachycardia (VTach). By that time, I had worked as a Monitor Technician for over 12 months (3 months at LifeWatch, Inc., 6 months at Kaiser Permanente Medical Center in Oakland, and 3 months at Alameda Health System) 40 hours a week, but I never saw Ventricular Tachycardias that had the shapes of the waves that I had observed on patient X. The episodes of these waves lasted for approximately 1-2 seconds and shifted to Normal Sinus Rhythm. Later, these unusual waves appeared again for another 1-2 seconds and shifted back to Normal Sinus Rhythm. Because the picks of these waves marched out with the previous Normal Sinus Rhythm, I

Complaint for Damages.

interpreted these unusual waves as artifacts. I printed out several rhythm strips with these unusual waves, signed and dated them, and I wrote down my rhythm interpretation as Normal Sinus Rhythm, Artifacts. I heard that the patient was still not responsive. I also heard how Charge Nurse ordered patient X's nurse to call a Rapid Response Team. In my strongest opinion, both Charge Nurse and patient X's nurse were supposed to be with the patient performing CPR. However, I saw both nurses in a hallway, therefore it was obvious that they both were not with the patient. Charge Nurse approached a Cardiac Monitoring station and asked me what cardiac rhythm patient X had. I showed her these unusual waves, and I said that they were artifacts. Charge nurse disagreed, and she said that these waves were episodes of Ventricular Tachycardia. Soon after that, I saw how members of a Rapid Response Team showed up in the unit and ran to patient X's room to perform CPR. The time was approximately 7.00 AM. I saw resident Dr. Rachmani who was standing in a hallway next to the Cardiac Monitoring station. I gave Dr. Rachmani printouts with patient X's unusual waves and said that I think that these waves were artifacts. I demonstrated to Dr. Rachmani how the picks of these waves perfectly marched out with the previous Sinus Rhythm. I asked Dr. Rachmani to express his opinion about the nature of these waves, if they really were artifacts or if they were episodes of Ventricular Tachycardia. Dr. Rachmani asked if these rhythm strips belonged to irresponsive patient X. I said, "Yes, these are rhythm strips of patient X who is irresponsive." Dr. Rachmani looked at these rhythm strips very carefully. He said, "I agree with you" meaning that these waves were artifacts.

Soon after that, another Monitor Technician Ms. Doniea Lawson came to the beginning of her shift. I showed Ms. Lawson patient X's rhythm strips, and I said that the patient was irresponsive, and a Rapid Response team was performing CPR on him. I also said that I had consulted with Dr. Rachmani about patient X's EKG, and the doctor agreed with me that these waves were artifacts and not VTach.

Patient X died. When I came to my next shift, I was not allowed to perform my duties as a Monitor Technician, and I was sent home. I was ordered to show up to a meeting on a particular day. When I showed up to that meeting at Highland Hospital, I learned that patient X's regular nurse and a Charge nurse who both worked on the night when the patient died were also

Complaint for Damages.

1  restrained from performing their duties. There was a meeting with the three of us. We gave our

2  explanations about what happened. I said that I had consulted with Dr. Rachmani, and he said

3  that he had agreed with me that these unusual waves were artifacts and not episodes of VTach.

4  After that meeting, the three of us (me, a regular nurse, and a Charge nurse) were allowed to

5  come to our next shifts and perform our regular duties. However, we were informed about the

6  necessity to present at three RCA (Root Cause Analysis) meetings regarding patient X's death.

7  I came to the next shift and started to perform my regular duties as a Monitor Technician.

8  I came to three RCA meetings, and I gave my explanation to the Highland Hospital's

9  Committee. I showed how the picks of these unusual waves perfectly marched out with the

10  previous Normal Sinus Rhythm. I also said at every meeting that I had talked to Dr. Rachmani,

11  and he agreed with me that these waves were artifacts and not episodes of Ventricular

12  Tachycardia. Dr. Rachmani himself was absent at all three meetings. I also gave the approximate

13  time when I showed these rhythm strips to Dr. Rachmani (it was approximately 7.00 AM or

14  maybe 7.12 AM).

15  These three RCA meetings occurred on different days with some intervals. While

16  attending these meetings, I was allowed to perform my duties as a Monitor Technician. I came to

17  every shift (excluding one or two times when I had a surgery at Kaiser Permanente Medical

18  Center in Richmond and some other medical appointment). From my point of view, I did my best

19  explaining the logic of my thoughts when I saw these unusual waves, how I consulted with Dr.

20  Rachmani, and how I reported to Ms. Doniea Lawson about these waves. I think that even before

21  these three RCA meetings I came to the office of Mr. Gilbert Harding who at that time started to

22  perform duties of a Director of Step Down Unit, and I explained to Mr. Harding that I had

23  consulted with Dr. Rachmani who agreed with me that these waves were artifacts and not

24  episodes of VTach.

25  On approximately August 25th, I approached Mr. Harding, and I expressed verbal

26  concerns about my salary and benefits at Highland Hospital. I showed Mr. Harding my offer

27  letter that I got before getting employed, and I said that my salary is much less than I had been

28  offered. Mr. Harding promised to think about why it was going on. About ten days later, I still

Complaint for Damages.

didn't hear any reasonable answer from Mr. Harding. I came again to Mr. Harding's office, and I politely reminded him about my previous visit and the problems with my salary and benefits. I said to him that I would send him a written letter pointing out all these and some other issues. On September 5th, I emailed my written letter to Mr. Harding. Two days later, on September 7th I was fired twenty minutes after I had come to my shift. In the termination letter, I read that I had been released from my employment due to the discrepancies acceptable employment standards and those I exhibited during my employment with Alameda Health System. At that time, Mr. Adam Cole who is a Labor Analyst was present in Mr. Harding's office. I asked both Mr. Harding and Mr. Cole to give me examples of these alleged discrepancies. Mr. Cole's answer was, "We are not talking about it now." I repeated my question, and Mr. Cole answered the same phrase, "We are not talking about it now."

Reading a letter from the Department from Department of Industrial Relations, the Division of Labor Standards Enforcement, I learned that Alameda Health System claims that the decision about my termination was made because of my "negligence" that seriously harmed the patient as well as I "knew" that I was facing termination prior to my letter to Mr. Harding on September 5th.

Both these statements are a lie. Alameda Health System is lying to the Department of Industrial Relations, Division of Labor Standards Enforcement about the reasons of my termination. I will give you the evidence about why these statements are a lie.

1. When I saw the unusual forms of the waves of patient X's EKG, I consulted with Dr. Rachmani and asked him to express his opinion. I said to him that patient X was irresponsive. During the time while Dr. Rachmani was reviewing the rhythm strips, a Rapid Response team was performing CPR on patient X. Dr. Rachmani knew about it. However, his opinion was that these waves were artifacts and not episodes of Ventricular Tachycardia.

2. I showed these waves to Ms. Doniea Lawson who is a Monitor Technician. I said to her how I interpreted these waves (I interpreted them as artifacts and not VTach). I also said

Complaint for Damages.

to Ms. Lawson that I had consulted with Dr. Rachmani, and he agreed with me that these waves were artifacts and not episodes of VTach.

3. I gave the same explanation to Mr. Harding and to all members of the Committee at three Root Cause Analysis meetings at Highland Hospital.

4. If Mr. Harding or other members of the Committee said that these waves were not artifacts but episodes of Ventricular Tachycardia, I would not have been allowed to perform my duties as a Monitor Technician after patient X's death. However, I was allowed to perform my duties as a Monitor Technician, and I worked for approximately 2 months after patient X's death.

5. If I were terminated due to my negligence because I missed a lethal cardiac rhythm, I would have been notified about it by my Manager, Director, or any other member of the Committee. However, nobody told me that I was going to be terminated due to my negligence because I had missed a lethal cardiac rhythm. Prior to September 7th, 2013, nobody told me that Alameda Health System was going to terminate my employment. Even when I asked Mr. Harding and Mr. Cole why I was terminated on the day of the termination, and I asked to give me any examples of alleged discrepancies between acceptable employment standards and those I exhibited during my employment with Alameda Health System, the answer was, "We are not talking about it now."

6. I worked as a Monitor Technician at Kaiser Permanente Medical Center in Oakland in 2011 and 2012 for six months. There was an episode of negligence expressed by one of the nurses towards the patient. As a result of that negligence, the patient died. The nurse was terminated immediately. He was revoked his RN license, and he was not allowed to perform his duties as an RN immediately after the patient's death. In my case, I worked for another approximately two months after patient X's death. So, the statement of Alameda Health System that I was terminated due to my negligence to patient X is inconsistent and discrepant.

7. I have a CCT (Certified Cardiographic Technician) certificate that is given by Cardiovascular Credentialing International in 2011. If I demonstrated real negligence to

Complaint for Damages.

patient X, my certificate would have been immediately revoked. However, during my employment with Alameda Health System nobody including Mr. Harding told me that I had demonstrated negligence to patient X. I still hold my CCT certificate. You can check the status of my certificate on the Cardiovascular Credentialing International

http://www.cci-online.org/content/credential-verification

Please, type my last name Drevaleva, and you will see that my CCT certificate is still valid.

8.  If I were terminated due to my negligence towards patient X, I would not have received unemployment insurance benefits. However, I received unemployment insurance benefits after my termination from Alameda Health System.

9.  If I were terminated due to my negligence towards patient X, no one other employer would have offered me a job of an EKG or Monitor Technician. In April 2014, I got a job offer for a position of an EKG Technician at Children's Hospital in Oakland, CA through staffing agency H.E.L.P., Inc. My recruiter's name is Ms. Alana Bell. She checked the status of all my certificates, and she found all of them valid. I got completely checked before starting my employment with Children's Hospital in Oakland. However, I informed Ms. Bell that I was going to go to Russia to do an oral surgery, and because of that my employment with Children's Hospital didn't start.

10. I also filled out many job applications at Veterans Affairs Administration. You know the nature of this organization. Before offering a job interview, the recruiter checks the status of all certificates as well as references. I received a few notifications over the email that I was fully eligible to get a job at the VA. I was even offered a job interview with the VA Medical Center in Detroit. However, I informed the recruiter that at that time I was in Russia (I am still in Russia waiting for another surgery). If I were fired from Alameda Health System due to my negligence towards patient X, I would have never been offered any job with any employer, especially the VA Medical Center in any city.

You asked to give you a list of witnesses. I will give you the names and the contact information (if I know it).

Complaint for Damages.

1) Dr. Rachmani who is a resident of Alameda Health System. I don't know his contact information. However, I found his name on Alameda Health System's web-site http://acmcmedicine.org/im-residency/residents/C2

   His name is Mr. Sina Rachmani. Please, contact with him through Alameda Health System.

2) Ms. Doniea Lawson who is a Monitor Technician. Her email addresses are: d.lawsoncbspd@hotmail.com

   doniea d.lawsoncbspd@hotmail.com

   I don't know Ms. Lawson's personal phone number. She gave it to me, but I lost my cell phone and her number with it. I know her email addresses because we exchanged emails with her regarding our offer letters and our actual salaries. I told Ms. Lawson about my letter to Mr. Harding on September 5th, and emailed her a copy of that letter.

3) Mr. Adam Cole and Mr. Gilbert Harding who both gave me a termination letter on September 7th, 2013. They both can confirm that I asked about alleged discrepancies between acceptable employment standards and those I allegedly exhibited during my employment with Alameda Health System. Mr. Cole's answer was. "We are not talking about it now." He said it twice. I think that Mr. Cole can confirm that he said it, and Mr. Harding is a witness.

4) Employment Development Department who can confirm that I was getting unemployment insurance benefits after being terminated from Alameda Health System. The phone number of EDD is 1-800-300-5616

   The address of EDD is:

   Employment Development Department

   P.O. Box 826880 - UIPCD, MIC 40

   Sacramento, CA 94280-0001

Complaint for Damages.

5) Ms. Alana Bell who is a recruiter at H.E.L.P., Inc. She checked the status of my certificates, and she offered me employment with Children's Hospital in Oakland, CA in April 2014. Ms. Bell's email address is Abell@helpstaffs.com

Her phone number is 888-435-7689.

6) Ms. MeKanya Rayford who is a RN, Clinical Nurse Manager at VA John Dingell Medical Center in Detroit, MI. She sent me an invitation to a job interview for a position of a Monitor Technician in June 2014. Her email address is Mekanya.Rayford@va.gov

Her phone numbers are:

313 576 2720- Cisco

313 576 4412- Office

313 250 0365- Pager

313 576 2711- A4 Charge Nurse Cisco.

7) I want to give you the name of another Monitor Technician at Alameda Health System who shared with me that she was also unpleased with the salary that she was getting at Alameda Health System. Her name is Maria. Unfortunately, I don't remember her last name. I don't know her email address. I think I have her phone number written in a piece of paper, but this piece of paper is in the United States, and currently I am in Russia. Therefore, there is no way for m to provide you with this number. Maria is not a direct witness of what happened with patient X. However, she could confirm that she was also unpleased with the discrepancy between her offer letter and the amount of salary that she was getting at Alameda Health System.

8) There was another lady who worked as a Monitor Technician and with whom I shared the same issues about my offer letter and the amount of salary and benefits at Alameda Health System. Unfortunately, I don't remember the name of that lady. While I was working at Alameda Health System, that lady was pregnant. I don't know is she is working now. I also have her phone number written on a piece of

Complaint for Damages.

1  paper, but it is in the United States. Therefore, there is no way for me to provide you

2  with this number.

3  9)  I will give you the name and the contact information of my closest friend Mr. Justin

4  Fletcher. He lives in Portland, OR. We frequently communicate with him over the

5  phone. I shared with him what had happened with patient X. I told him over the

6  phone that I had consulted with Dr. Rachmani, and the doctor said that these waves

7  were artifacts and not episodes of VTach. Mr. Fletcher is also aware of three RCA

8  meetings and my responses at these meetings. Mr. Fletcher also knows that I

9  continued my employment with Highland Hospital after patient X's death.

11  Summary:

12  1)  In the letter of The Department of Industrial Relations, the Division of Labor Standards

13  Enforcement I read that I was terminated from Alameda Health System due to my

14  negligence that seriously harmed the patient. In my letter, I gave a detailed explanation

15  about what happened with that patient. I also gave examples of evidence of why my

16  interpretation of a cardiac rhythm was not considered as negligence. I still don't feel that

17  I expressed negligence towards patient X. I feel that I did my best interpreting the

18  patient's cardiac rhythm and consulting with the doctor about my interpretation. I also

19  gave the examples of why Alameda Health System's claim about this negligence is a pure

20  lie. Please, review again my explanation, and you will obviously see all inconsistencies

21  and discrepancies that Alameda Health System presents about my case.

22  2)  Alameda Health System claims that I was already aware about plans to terminate me

23  prior to September 5th when I sent a letter to Mr. Harding. This is another pure lie, and

24  Alameda Health System can't give you any evidence that they notified me about their

25  plans to terminate me due to my alleged negligence. I was never written up, and I never

26  got any verbal warnings regarding anything during my employment with Alameda Health

27  System. You can request a copy of my personal file from Human Resources of Alameda

28  Health System, and you will not find any record that says that I had a verbal warning, I

Complaint for Damages.

was written up, or I was notified about the plans of Alameda Health System to terminate me. Moreover, even during my termination on September 7th, 2013 I was not given any particular reason for my termination. Therefore, the statement of Alameda Health System that I knew that I was going to be fired is another pure lie.

Because Alameda Health System retaliated me regarding the issues that I listed in my letter to Mr. Harding on September 5th, and because Alameda Health System lied to the Department of Insustrial Relations, the Division of Labor Standards Enforcement, I demand:

1) To immediately reinstate me at work as a Monitor Technician at Alameda Health System. I performed my duties as a Monitor Technician in good faith everywhere I worked. I want to protect my good name as well as I want to continue to observe cardiac monitors and help patients of Alameda County.

2) To pay me all my salary for all months that I didn't work due to my retaliation and termination from Alameda Health System.

3) To pay me all my benefits that I didn't get while being employed by Alameda Health System and after my termination.

4) To pay me some sum of money for harming me morally and putting dirt on my good name by Alameda Health System. I will discuss this sum with your representative.

Please, notify me about your decision over my email

tdrevaleva@gmail.com

Please, don't send me any letter to my home postal address in Oakland. Please, don't call my cell phone number. Currently, I am in Russia waiting for the second surgery that will be in July 2014. I don't know when I will come back to the United States. After getting your response, I will notify you when I am planning to come back to the USA. It depends on the results of the second surgery that will be on July 10th, 2014.

Thank you for your time and consideration,

Respectfully,

Tatyana Evgenievna Drevaleva."

Complaint for Damages.

1    **56. After I sent my June 18, 2014 letter to Ms. Daly, I didn't hear from her at all for**

2    **over two years.** I am reminding that the plain language of the California Labor Code Section

3    98.7(e) imposed a mandatory obligation (the word "shall") on the Labor Commissioner to notify

4    me and the Alameda Health System about the determination of my retaliation and unlawful

5    termination claim within 60 (sixty) days from September 16, 2013 when I submitted this claim to

6    the DIR/DLSE.

7

8    **57. In July 2016, I returned back to the United States from Russia**. I contacted with

9    Ms. Daly via email, and I asked her to notify me about the time frame when she will finish the

10   investigation of my retaliation and unlawful termination claim.

11

12   **58. Ms. Daly's August 25, 2016 at 10.07 AM attempt to coerce me to withdraw my**

13   **retaliation and unlawful termination claim**.

14          On August 25, 2016 at 10.07 AM, Ms. Daly sent me an email (**ER 07414 Vol. 1, pages**

15   **133-134**) where she wrote, "Dear Ms. Drevaleva:

16          I hope this message finds you well.

17          Unfortunately, I cannot find for you in this matter. The evidence shows alameda Health

18   System had a legitimate, nondiscriminatory reason to terminate your employment (I refer to

19   patient incident.)

20          Today, I need to confirm your mailing address. Why? I will prepare the dismissal in this

21   matter. After my boss reviews it, our Sacramento office will mail serve both parties. You will

22   have 10 days to appeal the matter to the California Director of Industrial Relations.

23          If you prefer I will not prepare a public report, please, sign and return the enclosed

24   withdrawal slip. You may email it back.

25          Take care,

26          Cathy Daly."

27

28

Complaint for Damages.

59. Please, take a Judicial Notice of Ms. Daly's August 25, 2016 at 10.07 AM email (**ER 07414 Vol. 1, page 134**), "The evidence shows alameda Health System had a legitimate, nondiscriminatory reason to terminate your employment (I refer to patient incident.)" Please, notice that Ms. Daly failed to identify what the evidence is (whether it is a testimony of a witness, or a document from the Alameda Health System, or anything else that could explain and/or confirm the allegation about the "patient incident.")

60. On August 25, 2016, Ms. Daly sent me a Withdrawal form and attempted to coerce me to withdraw my retaliation and unlawful termination claim "on my own free will", see (**ER 07414 Vol. 3, page 596**), "**Withdrawal of DLSE Retaliation Claim**

Re: Drevaleva vs. Alameda Health System

State Case 32741-SFRCI

I withdraw my Labor Commissioner's Office Retaliation Complaint. It is Drevaleva vs. Alameda Health System, 32741-SFRCI.

I decide this based on my own free will.

Tatyana Drevaleva                     Date."


I refused to sign the form.

**61. My August 25, 2016 at 1.00 PM email to Ms. Daly.** On August 25, 2016 at 1.00 PM, I sent an email to Ms. Daly (**ER 07414 Vol. 1, page 133**), "Hi Cathy!

I strongly disagree with you. Alameda Health System retaliated me for sending a letter to the Department Manager with a question why I get benefits of a part time employee while working actually full time. I am not going to withdraw my retaliation complaint.

If Alameda Health System wanted to fire me due to the incident with the patient, they would fire me immediately after the patient's death. Like I said before, I consulted with an MD[1]

---
[1] A Medical Doctor.

Complaint for Damages.

1  the EKG tracing, and I thought it was artifact and not V-Tach. The MD agreed with me. Later,

2  Alameda Health System had numerous meetings regarding this incident. I explained in detail

3  many times my thoughts and mentioned the fact that I consulted with an MD about the patient's

4  EKG. Alameda Health System allowed me to continue working as a Monitor technician for

5  approximately 1.5 months after the patient's death. In September 2013, two days after I send a

6  letter to a Department Manager with questions why I receive benefits of a part time employee

7  while working as a full time employee, I was fired.

8      It doesn't make any sense that Alameda Health System fired me in approximately 1.5

9  months after the patient's death as they claim.

10      I was in Russia for approximately 2.5 years starting April 2014 and ending July 2016.

11  Now, I am living in San Jose. I am going to follow up with my complaint to the Department of

12  Industrial relations regarding Alameda Health System.

13      You may reach me at (my former phone number.) Please, set an appointment to see you

14  in person.

15      My mailing address now is: (my former mailing address in San Jose, CA,)

16      Respectfully,

17      Tatyana Drevaleva."

18

19      62. Please, take a Judicial Notice that in my August 25, 2016 at 1.00 PM email to Ms.

20  Daly I explained again that I had not committed medical negligence towards the patient, that the

21  Medical Doctor confirmed my EKG interpretation, that after the incident with the patient the

22  Alameda Health System didn't fire me, and that the AHS fired me in two days after I asked the

23  Department Manager why I was getting the benefits of a Part Time employee while actually

24  working full time. Please, also take a Judicial Notice that in this email I asked Ms. Daly to meet

25  with me in person.

26

27

28

Complaint for Damages.

**63. Ms. Daly's August 25, 2016 at 1.08 PM email to me**. On August 25, 2016 at 1.08 PM, Ms. Daly sent me an email (**ER 07414 Vol. 1, page 132**), "I will call you next week to discuss the email.

However, I read our rebuttal and did not find it convincing. The passage of time (1.5 months) is not long considering Alameda Health needed to fully investigate the matter.

You may present these arguments in your appeal after your final decision arrives.

Cathy Daly,"

64. Please, take a Judicial Notice that in her August 25, 2016 at 1.08 PM email Ms. Daly didn't identify that she had actually followed the mandatory requirements of the California labor Code Section 98.7(b) such as:

1) To interview Claimant Tatyana Drevaleva
2) To interview the CEO of the AHS Ms. Lassiter or a Director of Step Down Unit Mr, Gilbert Harding
3) To interview the witnesses whom I listed in my June 18, 2016 email to Ms. Daly
4) To review the documents from the AHS.

65. Please, take a Judicial Notice that in her August 25, 2016 at 1.08 PM email Ms. Daly announced that she hadn't found my June 18, 2014 rebuttal convincing. I am emphasizing that Ms. Daly's sole opinion was not a true and genuine point of view of the Alameda Health System. There was no evidence that Ms. Daly ever presented my June 18, 2014 rebuttal to the Alameda Health System, and there was no evidence that Ms. Daly ever received any documentation from the Alameda Health System regarding the incident with the patient.

66. Therefore, it is undisputed that the decision to deny my retaliation and unlawful termination claim belonged solely to Ms. Catherine Daly, and this decision was not based on the procedures that were established by the California Labor Code Section 98.7(b.)

Complaint for Damages.

**67. My August 25, 2016 at 3.01 PM email to Ms. Daly where I demanded to schedule a hearing of my retaliation and unlawful termination claim.** On August 25, 2016 at 3.01 PM, I sent an email to Ms. Daly (**ER 07414 Vol. 1, page 132**), "Hi Cathy!

I demand to set a date of hearing regarding this case. It is obvious that you failed to read my email carefully. I didn't know if you are the only person to issue a decision regarding my case. I don't even know if you are entitled to make a decision alone instead of presenting my case to the Commission. Therefore, I demand to set a date of hearing and meeting with you and other members of the Commission in person instead of discussing my case over the phone with only you.

Regards,

Tatyana Drevaleva."

68. Please, take a Judicial Notice that in my August 25, 2016 at 3.01 PM email to Ms. Daly I explicitly demanded a hearing with the Commission regarding my retaliation and unlawful termination claim. Please, take a Judicial Notice that in my August 25, 2016 at 3.01 PM email to Ms. Daly I explicitly pointed out that Ms. Daly had not been authorized to make sole decisions about my retaliation and unlawful termination claim.

69. Please, notice that, after I sent my August 25, 2016 at 3.01 PM email to Ms. Daly, I didn't hear from her for five days.

**70. Ms. Daly's August 30, 2016 at 10.58 AM email to me where she refused to schedule a hearing.** On August 30, 2016 at 10.58 AM, Ms. Daly sent me an email (**ER 07414 Vol. 1, page 131**), "Ms. Drevaleva,

Hopefully, this message finds you well.

Unfortunately, a hearing is not available in this matter. I understand our procedures mention hearings but we reserve them for special cases involving child care providers.

Complaint for Damages.

1    As the assigned investigator, I have the obligation to issue a recommended decision. If

2  it's in favor of the employee, I approach the employer about settlement. But when it's in favor of

3  the employer, I talked to the employee about a possible withdrawal.

4    No Commission is involved.

5    You will have the right to appeal the final decision. Once I complete it in September, the

6  report will go forward to my supervisors for approval. After my superiors sign off, they will mail

7  it to the address you recently provided. Then you will have 10 days to send a written appeal to

8  the Director of Industrial Relations.

9    Cathy Daly."

10

11   71. Please, take a Judicial Notice that in her August 30, 2016 at 10.58 AM email Ms.

12  Daly refused to schedule a hearing, refused to change her mind, informed me that the

13  Determination would be in September 2016m, and reminded me about an opportunity to appeal

14  the Determination with the Director of the DIR within 10 days from the issuance of the

15  Determination.

16

17  **72. My August 30, 2016 at 5.14 PM email to Ms. Daly where I asked her about the**

18  **statutes that governed my retaliation and unlawful termination claim and where I**

19  **reminded her that about my June 18, 2014 (two years ago) email to her.** On August 30, 2016

20  at 5.14 PM, I sent an email to Ms. Daly (**ER 07414 Vol. 1, page 131, see the same email on**

21  **page 130**), "Ms. Daly,

22    What articles of law do you follow in this matter? Could you, please, list them to me? I

23  will go to the law library and I will investigate it myself.

24    Also, approximately two years ago I sent a detailed explanation about what happened

25  between my employer and me over the email from Russia. Did you get that email? If not, I will

26  re-submit it to you. Actually, I prefer to go to your office and submit the letter in person. I will

27  make sure to do it next week.

28    Regards,

Complaint for Damages.

1    Tatyana Drevaleva."

2

3        73. Please, notice that in my August 30, 2016 at 5.14 PM email I reminded Ms. Daly

4    about my email that I sent to her on June 18, 2014 that was over two years ago and where I

5    provided Ms. Daly with a detailed explanation about what happened between my employer the

6    Alameda Health System.

7

8        **74. Ms. Daly's August 31, 2016 at 7.48 AM email to me**. On August 31, 2016 at 7.48

9    AM, Ms. Daly sent me an email (**ER 07414 Vol. 1, page 130**), "I read your email and I still have

10   it.

11       I did not find it persuasive.

12       Please, look to Labor Code 98.7 [a web-link.]

13       You may also see our web-site [a web-link.]

14       You may leave any materials for me at our 10th Floor counter desk. Just put my name on

15   the envelope.

16       Catherine S. Daly."

17

18       75. Please, take a Judicial Notice that:

19       1) In her August 31, 2016 at 7.48 AM email to me, Ms. Daly specifically cited the

20          California Labor Code Section 98.7

21       2) However, it was obvious that Ms. Daly violated Labor Code Section 98.7(e) because

22          Ms. Daly failed to notify me with the Determination about my retaliation and

23          unlawful termination claim within 60 days from September 16, 2013 when I filed this

24          claim

25       3) Also, it is obvious that Mr. Daly solely decided to dismiss my retaliation and

26          unlawful termination claim because she hadn't found my June 18, 2014 rebuttal letter

27          persuasive. In her August 31, 2016 at 7.48 AM email to me, Ms. Daly didn't indicate

28

Complaint for Damages.

that she had actually followed the procedures that were described at Labor Code Section 98.7(v) such as:

    a)  To interview Claimant Tatyana Drevaleva

    b)  To interview Respondent the Alameda Health System meaning to interview the Chief Executive Officer of the AHS Mr. Lassiter and/or to interview my former Supervisor and Director of the Step Down Unit Mr. Harding, and not to interview Labor Analyst Mr. Adam Cole who played no role in evaluating my performance at the AHS and who played no role in the termination of my employment from the AHS on September 07, 2013

    c)  To interview the witnesses whom I listed in my June 18, 2014 letter to Ms. Daly

    d)  To review the documents from the AHS that were related to my employment from April 01 to September 07, 2013, to my performance, and to the termination of my employment on September 07, 2013.

    4)  Also, it is obvious that in her August 31, 2016 at 7.48 AM email to me Ms. Daly refused to meet with me in person, and she directed me to leave any document for her at the counter desk on the 10th Floor.

76. Following the August 31, 2016 at 7.48 AM email of Ms. Daly, I asked my friend Ms. Liliya Nagul to deliver the paper copy of my June 18, 2016 email to the counter desk at the 10th Floor. On approximately September 06, 2016, my friend Ms. Nagul delivered a printed copy of my June 18, 2014 rebuttal letter to the counted desk on the 10th Floor.

77. Please, notice that, after receiving my June 18, 2014 letter the second time, Ms. Daly still refused to meet with me in person, and she failed to provide me with the detailed explanations about why she found my June 18, 2014 rebuttal letter unpersuasive and why she solely decided to deny my retaliation and unlawful termination claim.

**78. My attempt to get another Deputy of the Labor Commissioner to investigate my retaliation and unlawful termination claim**. On September 06, 2016, I sent a letter to the Labor Commissioner (the San Francisco office) with a request to assign another Deputy of the

1    Labor Commissioner to investigate my retaliation and unlawful termination claim (**ER 07414**

2    **Vol. 1, pages 52-53**),

3    "To the Labor Commissioner

4    Department of Industrial Relations

5    455 Golden Gate Ave, 10th Floor

6    San Francisco, CA 94102

7    From Tatyana Evgenievna Drevaleva

8    6100 California Str.,

9    San Francisco, CA, 94121.

10

11   August[2] 6, 2016

12   Dear Labor Commissioner!

13   My State case number is 32741 Drevaleva v. Alameda Health System. My case was

14   assigned to Ms. Catherine Daly, the deputy of the Labor Commissioner. I had a correspondence

15   with Ms. Daly via email when I was in Russia and when I returned back to the United States. I

16   didn't get the impression that Ms. Daly pays attention to all details of my case. She sent me an

17   email with a request to withdraw my case which I refused to do. Even though I sent her detail

18   explanations about what happened, Ms. Daly still seems to be ignorant to my case and me. She

19   keeps saying that my explanations are not persuasive but she doesn't explain why.

20   I am asking you to assign another Deputy of the Labor Commissioner to work with my

21   case. I am also demanding to set a hearing date about my case with the Committee of the Labor

22   Commissioner.

23   Thank you,

24   Respectfully,

25   Tatyana Drevaleva."

26

27   _____

28   [2] I believe that I erroneously dater letter August 06, 2016 instead of September 06, 2016.

Complaint for Damages.

1   79. Please, notice that the Department of Industrial Relations refused to listen to me and

2   refused to assign another Deputy of the Labor Commissioner to work on my retaliation and

3   unlawful termination claim.

4

5   **80. Ms. Daly's refusal to meet with me in person and to speak to me over the phone.**

6   In approximately November 2016, Ms. Daly attempted to schedule a phone conversation with

7   me but I was unable to keep that appointment over the phone. I sent an email to Ms. Daly, I

8   explained that was unable to keep that phone appointment, and I asked to re-schedule the

9   appointment. Ms. Daly refused to re-schedule the phone appointment.

10

11   **81. My December 2016 – January 2017 email exchange with Ms. Daly's Supervisor**

12   **Ms. Joan Healy**. In December 2016, I started to communicate with Ms. Daly's Supervisor Ms.

13   Joan Healy. On December 12, 2016, I sent Ms. Healy the following letter via email to the

14   Sacramento Office (**ER 07414 Vol. 1, pages 54-55**),

15                                                              "To the Labor Commissioner

16                                                              Department of Industrial Relations

17                                                              Retaliation Unit

18                                                              2031 Howe Avenue, Suite 100

19                                                              Sacramento, CA, 95825

20                                                              From Tatyana Evgenievna Drevaleva

21                                                              6100 California Str.,

22                                                              San Francisco, CA, 94121

23   December 12, 2016

24   Dear Labor Commissioner!

25

26

27

28

Complaint for Damages.

1    I filed a retaliation case against Alameda Health System in 2013 after being retaliated and

2    fired. My case number is 32741. Last time, I had a communication with Department of Industrial

3    relations on August[3] 6, 2016. Since then, I haven't heard about the status of my case. I am asking

4    you to give me written information about the status of my case and the estimate time when you

5    case will be processed and finished.

6          Please, send me your written answer to my email address tdrevaleva@gmail.com

7          Thank you,

8          Respectfully,

9          Tatyana Drevaleva."

10

11   **82. Ms. Healy's December 19, 2016 at 6.41 PM email to me**. On December 19, 2016 at

12   6.41 PM, I received an email from Ms. Daly's Supervisor Ms. Joan Healy (**ER 07414 Vol. 3,**

13   **pages 597-598**), "Ms. Drevaleva,

14         Your email puzzled me. I have had several discussions about your case with Cathy Daly

15   the Deputy Labor Commissioner assigned to the investigation. She indicated that you had set a

16   time to discuss the status of the investigation last week, on Tuesday September 13[4] at 9:30 am,

17   an appointment you were unable to keep. You had committed to that time the day before and

18   indicated if you were unable to keep the appointment you would call Tuesday afternoon. You did

19   not call after the missed appointment.

20

21   _____

22   [3] I believe that the correct date is September 06, 2016.

23   [4] To the best of my knowledge, I never had a scheduled telephonic appointment with Ms. Daly

24   on September 13, 2016. Regardless, the DIR kept accusing me in missing a non-existent

25   September 13, 2016 telephonic appointment, the DIR never offered me to reschedule this alleged

26   appointment, and on December 29, 2016 the DIR dismissed my retaliation and unlawful

27   termination claim asserting that I'd been unable to keep my September 13, 2016 phone

28   appointment with Ms., Daly, see Ms. Healy's December 19, 2016 at 6.41 PM email to me.

Complaint for Damages.

1    In response, Cathy sent an email proposing several alternative time blocks on

2    Wednesday, Thursday and Friday to discuss your case, the first such email was sent on Tuesday

3    at 5 pm. You did not agree to any of the proposed discussion times and instead sent an email

4    mid-afternoon on Wednesday insisting on communication in writing and requested a status for

5    your case.

6    I have just completed the review of the finished report on your case and sent it to the

7    Assistant Chief for his review and signature. It may take only a few days before the

8    determination is mailed to you. Given the time of year, there may be an additional delay as staff

9    have pre-approved time off for the end of the year. I expect you will receive the determination no

10   later than mid-January, although I believe it will be out to you sooner than that date.

11   In the determination your right to an appeal will be part of the determination, please

12   review that section. I have attached the closing section of the report below so that you will be

13   prepared when you review the report.

14   The recommendation is that there is insufficient evidence of retaliation and therefore your

15   case will be closed.

16   The closing section of the report reads as follows:

17   You engaged in protected activities with your employer's knowledge. Further, your

18   employer admitted terminating you. However, you failed to connect your employer's knowledge

19   of your protected activities with the adverse actions it took against you. Instead, the evidence

20   established your employer's legitimate, non-retaliatory reasons for terminating you.

21   Accordingly, there is insufficient evidence to establish retaliation; therefore, this case will

22   be closed.

23   Any appeal of this closure must be filed with:

24   Christine Baker, Director

25   C/o OD Legal, RCI Appeals

26   1515 Clay Street, Suite 701

27   Oakland, CA 94612

28

Complaint for Damages.

For an appeal to be considered, the appealing party shall, within ten (10) days of the date of this Notice, seek review of this closure by writing the Director, Department of Industrial Relations, at the above address. The appeal shall set forth specifically and in full detail the grounds upon which the appealing party considers the closure to be unjust or unlawful, and every issue to be considered by the Director. This appeal to the Director is the only appeal authorized under Labor Code section 98.7. The Director's determination on appeal shall be considered the Labor Commissioner's final determination in accordance with Labor Code section 98.7.

In the event the Director determines that the closure was unwarranted, the Labor Commissioner shall remand the case to the assigned investigator for additional investigation in accordance with Labor Code section 98.7.

You are further advised that you may be able to bring an action against Respondent in the appropriate court of law to pursue your retaliation claim. You should consult with a private attorney to determine your rights and the time deadlines for filing a civil action.

Lastly, in case of an alleged violation of Labor Code section 6310 or 6311, you are further advised that you have the right to file a Complaint against State Program Administration (CASPA) with the U.S. Department of Labor, OSHA, San Francisco Federal Building, 90 7th Street, Suite 18100, San Francisco, CA 94103, Attention: Discrimination Programs.

Joan Healy."


**83. My December 20, 2016 at 8.05 AM email to Ms. Healy**. On December 20, 2016 at 8.05 PM, I sent an email to Ms. Healy (**ER 07414 Vol. 3, page 599**), "Hi Joan!

Thank you for your email. Actually, you accuse me in not coming to my appointment on September 13th. I had no idea about this appointment, so I have no idea about what you are talking about. Please, send me the proof that I was invited to any appointment on September 13th.

I submitted a letter asking to assign my case to another Deputy other than Ms. Catherine Daly. I am asking to give me a written answer why my case was not re-assigned to another deputy. I have the proof that I submitted my request to the San Francisco office.

Complaint for Damages.

As I understood, you are going to dismiss my case. It will be hard for you to do. I submitted a detailed letter to Ms. Daly where I explained everything going on between my ex-employer and me. Seems that Ms. Daly didn't pay attention to anything I said in this letter, and she was trying to force me to withdraw my case. This is why I submitted a written request to re-assign my case. Seems that you completely ignored my request, and I am asking you to send me a detailed explanation why you ignored it.

If you send me a denial letter, you are going to explain in detail every aspect of your denial according to every statement I listed in that letter.

If you send me a denial letter, I am going to follow all steps to file an appeal and later file a case in a court. Please, don't think that I will surrender.

If you want to send me any letter on paper, please, send it to the following address:

> Tatyana Drevaleva
>
> (my home postal address at that time in Mountain View, CA)
>
> Mountain View, CA, 94040.

Of course, I will have any communication with you or any other employee of the Labor Commissioner only in writing.

I am waiting for your answers.

Respectfully,

Tatyana."


84. I never heard from Ms. Healy.


**85. My December 29, 2016 at 8.01 email to Ms. Healy**. On December 29, 2016 at 8.01 AM, I sent an email to Ms. Healy (**ER 07414 Vol. 3, pages 599-600**), "Ms. Healy,

Happy Holiday Season! Happy New Year!

I sent you an email a few days ago. I asked you to send me a proof that I was invited to an appointment to Ms. Daly on September 13, 2016 as you claimed. You never responded that

Complaint for Damages.

1   question. To my best knowledge, I was not invited to any appointment to Ms. Daly on September

2   13, 2016.

3   　　　　Also, due to Ms. Daly's total negligence regarding my case and her attempt to make me

4   withdraw my case, I submitted a letter to the Department of Industrial Relations where I asked to

5   re-assign my case to another Deputy. I submitted this letter in August 2016. In December 2016,

6   my case was still not re-assigned. In your email dated December 19, 2016, you informed me

7   about your intention to dismiss my case due to "insufficient evidence" as you claimed. I asked

8   you to give me a written explanation why my case was not re-assigned but I've never heard back

9   from you.

10   　　　　I gave all detailed written explanations to Ms. Daly regarding my case twice – in June

11   2014 and August 2016. Regardless, you claimed that I hadn't provided sufficient evidence

12   regarding retaliation. Therefore, you informed me about your intention to dismiss my case. I

13   asked you to give me written explanations why the evidence is not sufficient regarding every

14   point of my letters that I submitted to the Department of Industrial Relations in June 2014 and

15   August 2016. You totally ignored my request, and I haven't heard from you.

16   　　　　I am repeating all three requests:

17   　　　　1)　　To send me a proof that I was invited my an appointment to Ms. Daly on

18   September 13, 2016,

19   　　　　2)　　To give me a written explanation why my case was not re-assigned to another

20   Deputy,

21   　　　　3)　　To give me written explanations why the evidence that I provided is not sufficient

22   regarding every point of my letters that I submitted to the Department of Industrial relations in

23   June 2014 and August 2016.

24   　　　　You also informed me that you were going to send me a letter which dismisses my case

25   in December or January. Have you already sent me this letter? I already prepared an appeal, and

26   I am ready to send it to Ms. Baker as soon as I receive your dismissal.

27   　　　　I am waiting for your answers.

28   　　　　Respectfully,

Complaint for Damages.

1   Tatyana Drevaleva

2   December 29, 2016."

3

4   86. I never heard back from Ms. Healy.

5

6   **87. My December 29, 2016 at 1.06 PM email to Ms. Healy**. On December 29, 2016 at

7   1.06 PM, I sent another email to Ms. Healy (**ER 07414 Vol. 3, pages 600-601**), "Ms. Healy,

8       You failed to answer my question. In our previous letter, you accused me for not coming

9   to an appointment to Ms. Daly on September 13th, 2016. Also, you accused me in not calling

10  Ms. Daly after that allegedly missed appointment. To the best of my knowledge, I was not

11  scheduled any appointment with Ms. Daly on September 13, 2016.This is why I asked you to

12  provide me with EVIDENCE that Ms. Daly scheduled an appointment with me on September 13,

13  2016. You failed to do it twice.

14      Here is a copy of your email to me dated December 19, 2016.

15          Ms. Drevaleva,

16              Your email puzzled me.  I have had several discussions about your case

17          with Cathy Daly the Deputy Labor Commissioner assigned to the investigation.

18          She indicated that you had set a time to discuss the status of the investigation last

19          week, on Tuesday September 13 at 9:30 am, an appointment you were unable to

20          keep.  You had committed to that time the day before and indicated if you were

21          unable to keep the appointment you would call Tuesday afternoon.  You did not

22          call after the missed appointment.

23              In response, Cathy sent an email proposing several alternative time blocks

24          on Wednesday, Thursday and Friday to discuss your case, the first such email was

25          sent on Tuesday at 5 pm.  You did not agree to any of the proposed discussion

26          times and instead sent an email mid-afternoon on Wednesday insisting on

27          communication in writing and requested a status for your case.

28

Complaint for Damages.

I have just completed the review of the finished report on your case and sent it to the Assistant Chief for his review and signature. It may take only a few days before the determination is mailed to you. Given the time of year, there may be an additional delay as staff have pre-approved time off for the end of the year. I expect you will receive the determination no later than mid-January, although I believe it will be out to you sooner than that date.

In the determination your right to an appeal will be part of the determination, please review that section. I have attached the closing section of the report below so that you will be prepared when you review the report.

The recommendation is that there is insufficient evidence of retaliation and therefore your case will be closed.

In your today's email to me, you sent me dates in December when Ms. Daly wanted to talk to me on the phone. I didn't get that email immediately, and I saw it only in a day or two days after Ms. Daly sent it to me. I didn't feel that I should talk on the phone with her because I already gave her detailed written explanations in my letters dated June 18, 2014 and August 6, 2016. I had nothing to add to these already written statements. Therefore, I requested my communication with Ms. Daly only in writing..

I don't care that Ms. Daly is one of the most experienced Deputies with years of experience. I informed you that she had tried to force me to withdraw my case "on my own free will". I am enclosing a copy of the form that she sent me in August this year. This is why I requested to re-assign my case which you didn't do. You provided me with a weak statement about why you didn't re-assign my case.

I was hoping that you would give me reasonable explanations about the reasons why you want to dismiss my case. I requested to give me your detailed explanations why you want to dismiss my case regarding every point that I listed in my letters to Ms. Daly in June 2014 and August 2016. You failed to do it.

I already prepared an appeal. As soon as you mail me your dismissal, I will appeal.

I am repeating my current mailing address:

Complaint for Damages.

Tatyana Drevaleva

(my home postal address at that time)

Mountain View, CA, 94040.

Please, send your decision to this address.

Respectfully,

Tatyana Drevaleva."

88. Again, I never heard back from Ms. Healy.

**89. My January 01, 2017 at 5.57 PM email to Ms. Healy**. On January 01, 2016 at 5.57 PM, I sent another email to Ms. Healy (**ER 07414 Vol. 3, page 602**), "Ms. Healy,

You still haven't sent me any EVIDENCE that I was invited to an appointment on September 13, 2016. I asked you three times to provide me with EVIDENCE but you refused to do it already three times.

Also, I asked you to provide me with DETAILED explanations WHY the evidence that I provided in my letters to Ms. Daly dated June 18, 2014 and August 6, 2016 is not sufficient to support my retaliation claim. You also refused to do it three times. I read no one word about it. You keep accusing me for missing an alleged appointment which didn't exist. You refuse to do your own job and fully investigate my case. Did Ms. Daly or you contact with any witnesses whom I listed in my letters to Ms. Daly? I guess the answer is no. Why?

Also, you didn't give me any reasonable explanations WHY my case was not re-assigned to another Deputy. Your explanations that you wrote in your previous letter are weak and not trustworthy.

I am waiting for your answer WHY neither Ms. Daly nor you ever contacted with any witnesses whom I listed in my letters to Ms. Daly.

Tatyana.'

90. Again, I never received any response from Ms. Healy.

Complaint for Damages.

1    **91. As of December 29, 2016, I had never received the Determination Letter in mail.**

2    I am repeating that Ms. Healy asked me to provide her with my home postal address, and she

3    explicitly notified me that the DIR/DLSE would mail a Determination Letter to my homepostal

4    address. Despite I provided Ms. Healy with my home postal address twice, as of December 29,

5    2016, I had never received the Determination Letter. Therefore, I was unable to appeal with the

6    Director of the DIR Ms. Christine Baker at that time.

7

8    **92. The damage that the Department of Industrial Relations, the Division of Labor**

9    **Standards Enforcement committed to me**. After I communicated with Ms. Daly and Ms.

10   Healy, after they denied my retaliation and unlawful termination claim, after the DIR

11   procrastinated for 3 years and 4 months deciding on my retaliation and unlawful termination

12   claim in violation of the California Labor Code Section 98.7(e), I was in a situation where:

13       1) On September 07, 2013, I was thrown out of my Part Time work at the AHS for

14          asking questions about unpaid both overtime and shift differentials, the denial of my

15          affiliation to the Union, missed `10 and 15 minute breaks, and for asking to transfer

16          me to a full time job while I was actually working full time

17       2) On January 07, 2014, the DIR denied my wage claim

18       3) On June 16, 2014 Ms. Daly accused me in committing medical negligence towards

19          the patient

20       4) The DIR investigated my retaliation and unlawful termination claim for 3 years and 4

21          months

22       5) The DIR notified me about its intention to demy my retaliation and unlawful

23          termination claim

24       6) The DIR never provided me with any explanations and any piece of evidence

25          regarding the allegation of the medical negligence towards the patient

26       7) The DIR accused me in missing a non-existent September 13, 2016 telephonic

27          appointment with Ms. Daly

28

Complaint for Damages.

8) Ms. Daly attempted to coerce me to withdraw my retaliation and unlawful termination claim

9) The DIR refused to assign another Investigator to investigate my retaliation and unlawful termination claim

10) Ms. Daly refused to meet with me in person

11) The DIR refused to conduct an investigative hearing of my retaliation and unlawful termination claim

12) Despite I provided the DIR with my home postal address in Mountain View at that time, and despite the DIR promised to send me the Determination Letter, the DIR in fact never sent me the Determination Letter thus depriving me of an opportunity to appeal the Determination with Director of the DIR within 10 days from the date of the Determination

13) The DIR never provided me with the date of the Determination

14) Ms. Healy never responded to three my emails where I asked her to give me detailed explanations about the non-existent September 13, 2016 telephonic appointment with Ms. Daly and about the reasons why the DIR wanted to deny my retaliation and unlawful termination claim

15) For three years and four months while the DIR was investigating my retaliation and unlawful termination claim, I was deprived of an opportunity to work in my professional field as a Monitor Technician, and I was compelled to stay in Russia because I didn't have health insurance in the United States

16) Because I didn't have an opportunity to work in my professional field as a Monitor Technician, I was also deprived of an opportunity to study in the United States, to get a better degree, to get a better paid job, to start a family, and to achieve my goals

17) The DIR accused me in committing medical negligence towards the patient thus putting dirt on my good name. Libel about the reasons of the termination of employment is a crime against reputation.

Complaint for Damages.

1    **93. The text of the December 29, 2016 DIR's Determination Letter that dismissed**

2    **my retaliation and unlawful termination claim asserting that I had been properly fired**

3    **from the Alameda Health System for committing medical negligence towards the patient.**

4    As I demonstrated above, despite I provided Ms. Joan Healy with my home postal

5    address in Mountain View twice, and despite I explicitly asked Ms. Healy to mail me the

6    Determination Letter, the DIR never mailed me the Determination Letter, and therefore I was

7    unable to file an Appeal of the Determination with Director of the California Department of

8    Industrial Relations Ms. Christine Baker.

9    94. With her February 09, 2017 Motion to Dismiss my Original December 29, 2016

10   Complaint No. 3:16-cv-07414-LB, Attorney Ms. Ng filed a redacted version of the December

11   29, 2016 Determination Letter (**ER 07414 Vol. 1, pages 135-137**.) Please, notice that Ms. Doris

12   Ng also emailed me the unredacted version of the December 29, 2016 Determination Letter (**ER**

13   **07414 Vol. 3, pages 603-605**),

14   "STATE OF CALIFORNIA Edmund G. Brown Jr., Governor

15   DEPARTMENT OF INDUSTRIAL RELATIONS

16   Division of Labor Standards Enforcement

17   2031 Howe Ave., Suite 100

18   Sacramento, CA 95825

19   Tel: (916) 263-2991

20

21   December 29, 2016

22   Tatyana Drevaleva

23   Re: Drevaleva v. Alameda Health System, a political subdivision of the State of

24   California

25   State case Number 32741-SFRCI

26   Dear Ms. Drevaleva:

27   The Labor Commissioner's Office finished investigating your September 11, 2013

28   Complaint alleging Alameda Health Systems (Alameda health), a political subdivision of

Complaint for Damages.

1   California, terminated you on September 7, 2013 in retaliation for complaining about wage

2   violations and unsafe working conditions. Labor Code 98.6 protects employees who complain to

3   their employer about improper wage payments. Labor Code 6310 safeguards employees who

4   raise safety issues with their employers, union representatives, or Cal-OSHA (California

5   Division of Occupational Safety and Health.)

6          You filed your complaint within six months of your termination, making it timely, and

7   the allegations contained in your complaint are within the Labor Commissioner's jurisdiction.

8   However, the investigation revealed no connection between your protected activities and your

9   termination.

10         You orally complained to Alameda Health Director of Critical Care Units Gilbert

11  Harding a few days before September 5, 2013. You followed up with a September 5, 2013 letter

12  complaining Alameda Health failed to pay you overtime and shift differentials; to give you

13  additional 10 minute breaks each hour, making watching vital monitors unsafe; toprovide you

14  regular breaks; and to allow you access to the Collective Bargaining Agreement's (CBA)

15  educational benefits.

16         You claim your oral and written complaints caused Alameda Health to terminate you on

17  September 7, 2013. However, Alameda Health denied your September 5, 2013 complaints led to

18  your termination. It produced a September 4, 2013 email from your direct supervisor Dana

19  Littlepage, RN, announcing you would be let go from probation and seeking Human Resource's

20  advice on next steps. This predated your September 5, 2013 letter to Harding.

21         In rebuttal, you amended your claim to say you spoke to Harding about "salary and

22  benefits" on August 25, 2013. This included showing him your offer letter purportedly proving

23  your salary was "much less that [she] had been offered." Harding allegedly promised to "think

24  about it." The language you used is vague, as such it is not clear that your raised issues this

25  office could investigate prior to the September 5, 2013 letter. Nothing in your rebuttal mentioned

26  you raised unpaid overtime, missed breaks, or ergonomic rights during this newly reported

27  August 25, 2013 conversation.

28

Complaint for Damages.

1    On September 7, 2013, Alameda Health dismissed you for "discrepancies between

2    acceptable employment standards and those you exhibited during her employment with us." The

3    evidence established a patient died during your employment. You denied any negligence and

4    noted Alameda Health kept you working as a monitor technician during the ensuing

5    investigation, failed to stop your unemployment, and never reported you to state licensing. While

6    these arguments are compelling, whether or not you performed negligently or others were

7    responsible are issues well outside the Labor Commissioner's jurisdiction.

8    On September 14, 2013, Alameda Health dismissed your workplace complaints by

9    pointing out public employees did not qualify for daily overtime; you miscalculated the overtime

10   given the employer's 24 hour workday; you needed to, and could have, notified your supervisor

11   about missing breaks; the additional 10 minute break ergonomic rule had not been applied since

12   2011; and your probationary status disqualified you from any Collective Bargaining Agreement

13   (CBA) educational benefits. In the claim you filed with the Labor Commissioner's Wage

14   Adjudication unit office these issues were dismissed for lack of jurisdiction.

15   Your claim for additional ten minute breaks as an ergonomic accommodation was

16   evaluated as a health and safety complaint. You were unable to provide any evidence you raised

17   this issue prior to your September 5, 2013 letter. There was no evidence this particular complaint

18   upset Alameda Health as this institution firmly believed the law had been repealed in 2011.

19   Significantly, Cal-OSHA did not intervene on this issue when you filed with them post-

20   termination, nor were citations issued. As a result, the evidence does not support that your

21   employer was motivated to take action against you for raising this issue.

22   Additionally, your probationary status meant Alameda Health could terminate you at any

23   time and without due process. Your involvement with medical negligence, whether peripheral or

24   not, also gave Alameda Health a compelling reason to terminate you.

25   You engaged in protected activities with your employer's knowledge. Further, your

26   employer admitted terminating you. However, you failed to connect your employer's knowledge

27   of your protected activities with the adverse actions it took against you. Instead, the evidence

28   established your employer's legitimate, non-retaliatory reasons for terminating you.

Complaint for Damages.

1    Accordingly, there is insufficient evidence to establish retaliation; therefore, this case will

2    be closed.

3    Any appeal of this closure must be filed with:

4            Christine Baker Director

5            C/o OD Legal, RCI Appeals

6            1515 Clay Street, Suite 701

7            Oakland, CA 94612

8    For an appeal to be considered, the appealing party shall, within ten (10) days of this

9    Notice, seek review of this closure by writing the Director, Department of Industrial Relations, at

10   the above address. The appeal shall set forth specifically and in full detail the grounds upon

11   which the appealing party considers the closure to be unjust or unlawful, and every issue to be

12   considered by the Director. This appeal to the Director is the only appeal authorized under Labor

13   Code section 98.7. The Director's determination on appeal shall be considered the Labor

14   Commissioner's final determination in accordance with Labor Code section 98.7.

15   In the event the Director determines that the closure was unwarranted, the Labor

16   Commissioner shall remand the case to the assigned investigator for additional investigation in

17   accordance with Labor Code section 98.7.

18   You are further advised that you may be able to bring an action against Respondent in the

19   appropriate court of law to pursue your retaliation claim. You should consult with a private

20   attorney to determine your rights and the time deadlines for filing a civil action.

21   Lastly, in case of an alleged violation of Labor Code section 6310 and 6311, you are

22   further advised that you have the right to file a Complaint against State Program Administration

23   (CASPA) with the U.S. Department of Labor, OSHA, San Francisco Federal Building, 90, 7th

24   Street, Suite 18100, San Francisco, CA, 94103, Attention: Discrimination Programs.

25   Sincerely,

26   ____[original signature]____

27   Eric Rood

28   Assistant Chief

Complaint for Damages.

Division of Labor Standards Enforcement."

95. **Legal Standard.**

In this current Second Amended Complaint, I will follow the F.R.C.P. Rule 8(a),

"(a) Claim for Relief. A pleading that states a claim for relief must contain:

> (1) a short and plain statement of the grounds for the court's jurisdiction, unless the court already has jurisdiction and the claim needs no new jurisdictional support;
>
> (2) a short and plain statement of the claim showing that the pleader is entitled to relief; and
>
> (3) a demand for the relief sought, which may include relief in the alternative or different types of relief."

I will only briefly describe each Cause of Action without getting into the detailed legal theories regarding each Cause of Action.

**96. Count No. 1.** Against the California Department of Industrial Relations.

Discrimination against my Russian Origin, Title VII of the Civil Rights Act of 1964.

The California Department of Industrial Relations routinely provided great protection to American, Asian, and other employees but didn't provide a protection to me because I am Russian. The California Department of Industrial Relations failed to initiate a proceeding against Respondent the Alameda Health System because I am Russian. The California Department of Industrial Relations discriminated me against my Russian origin.

**97. Count No. 2.** Against the California Department of Industrial Relations.

Discrimination against my race, 42 U.S.C. § 1981.

The California Department of Industrial Relations routinely provided great protection to the African-American and Asian employees but didn't provide any protection to me because I

Complaint for Damages.

am not an African-American and because I am not Asian. The California Department of Industrial Relations discriminated me against my race.

**98. Count No. 3.** Against the California Department of Industrial Relations.

A violation of the Fourteenth Amendment to the U.S. Constitution, the Equal Protection Clause.

The California Department of Industrial Relations routinely provided great protection to many other employees who were retaliated and unlawfully terminated from their jobs. The California Department of Industrial Relations didn't provide any protection to me in violation of the Fourteenth Amendment to the U.S. Constitution, the Equal Protection Clause.

**99. Count No. 4.** Against the California Department of Industrial Relations.

A violation of the Fourteenth Amendment to the U.S. Constitution, the Substantive Due Process Clause, deprivation of Liberty and property that I could have purchased if the DIR reinstated me back to work at the Alameda Health System.

**100. Count No. 5.** Against the California Department of Industrial Relations.

A violation of the Fourteenth Amendment to the U.S. Constitution, the Procedural Due Process Clause, deprivation of Liberty and property without the Due Process of the law.

Failure to investigate my retaliation and unlawful termination claim against the AHS according to the procedures that were established at the California Labor Code Section 98.7(b) such as:

1) To interview claimant Tatyana Drevaleva

2) To interview respondent the Alameda Health System

3) To interview the witnesses whom I listed in my June 18, 2014 letter to Ms. Daly

4) To review the documents from the Alameda Health System that were related to my employment at the AHS from April 01 to September 07, 2013, that were related to

Complaint for Damages.

my performance at the AHS, and that were related to the reasons of the termination of my employment from the AHS on September 07, 2013.

**101. Count No. 6.** Against the California Department of Industrial Relations.

A violation of the Fourteenth Amendment to the U.S. Constitution, the Procedural Due Process Clause, deprivation of Liberty and property without the Due Process of the law.

Failure to investigate my wage claim against the AHS according to the procedures that were established at the California Labor Code Section 98(a). Failure to inform claimant Tatyana Drevaleva and respondent the Alameda Health System about whether or not the DIR would conduct a hearing of my wage claim within 30 days from filing this claim.

**102. Count No. 7.** Against the Alameda Health System.

A violation of the Fourteenth Amendment to the U.S. Constitution, the Equal Protection Clause.

The Alameda Health System routinely provided great protection to other employees but failed to provide any protection to me.

**103. Count No. 8.** Against the Alameda Health System.

A violation of the Fourteenth Amendment to the U.S. Constitution, the Substantive Due Process Clause, deprivation of Liberty and property that I could have purchased if I were employed by the AHS.

**104. Count No. 9.** Against the Alameda Health System.

A violation of the Fourteenth Amendment to the U.S. Constitution, the Procedural Due Process Clause, deprivation of Liberty and property without the Due Process of the law.

On September 07, 2013, the Alameda Health System terminated my Part time employment without previously giving me a Notice and an opportunity to be heard.

Complaint for Damages.

**105. Count No. 9.** Against the Alameda Health System.

Discrimination against my Russian Origin, Title VII of the Civil Rights Act of 1964.

The Alameda Health System terminated my Part time employment because I am Russian. Also, the Alameda Health System terminated another employee of the Russian Origin Ms. Svetlana Muzychenko.

**106. Count No. 10.** Against the Alameda Health System.

Discrimination against my race, 42 U.S.C. § 1981.

The Alameda Health System terminated my employment because I am not African-American. The person who terminated my employment and who was a Director of the Step Down Unit Mr. Gilbert Harding is African-American.

Mr. Harding didn't terminate the employment of my African-American co-worker Mr. Doniea Lawson because she is also an African-American. Please, notice that Ms. Lawson also asked Mr. Harding questions about the denial of Ms. Lawson's affiliation to the Union, about missed 15 minute breaks, and about unpaid overtime and shift differentials. Mr. Harding didn't terminate Ms. Lawson and terminated me because I am not African-American.

**107. Count No. 11.** Against the Alameda Health System.

Retaliation and unlawful termination of my employment for asking questions in my September 05, 2013 letter to Mr. Harding about why the AHS hadn't provided me with the occupational 10 minute breaks every hour because I was an employee who was constantly observing video display screens (cardiac monitors.)

A violation of the Occupational Health and Safety Act (the OSHA.)

The Alameda Health System terminated my employment because I asked a question about missed 10 minute occupational health and safety breaks.

**108. Count No. 12.** Against the Alameda Health System.

Complaint for Damages.

1       Retaliation and unlawful termination of my employment in violation of the National

2 Labor Relations Act (the N.L.R.A.) and the Labor Management Relations Act (the L.M.R.A.)

3       The Alameda Health System denied my affiliation to the Union. The Alameda Health

4 System terminated my employment for asking questions in my September 05, 2013 letter to Mr.

5 Harding about why the AHS denied my affiliation to the Union.

6

7       **109. Count No. 13.** Against the Alameda Health System.

8       Retaliation and unlawful termination of my employment for asking questions in violation

9 of the Fair Labor Standards Act (the F.L.S.A.) or 29 U.S.C. § 215 - Prohibited acts; prima facie

10 evidence,

11       "(a) After the expiration of one hundred and twenty days from June 25, 1938, it shall be

12 unlawful for any person—

13       (3) to discharge or in any other manner discriminate against any employee because such

14 employee has filed any complaint or instituted or caused to be instituted any proceeding under or

15 related to this chapter, or has testified or is about to testify in any such proceeding, or has served

16 or is about to serve on an industry committee."

17

18       **110. Count No. 14.** Against the Alameda Health System.

19       The State Law claims.

20       I am not listing the claims under the laws of the State of California because these claims

21 are preempted by Section 301 of the Labor Management Relations Act (the L.M.R.A.)

22

23       **111. Count No. 15.** Against the Alameda Health System.

24       Racketeering activity within the meaning of the R.I.C.O. or 18 U.S.C. § 1962(a) because

25 the AHS unlawfully received big amounts of money in violation of the California Labor Code

26 Section 510(a) (failure to pay overtime premium for working in excess of 8 hours per day.)

27       Racketeering activity within the meaning of the R.I.C.O. or 18 U.S.C. § 1962(a) because

28 the AHS unlawfully denied my affiliation to the Union in order to avoid paying me shift

differentials such as 11% for working on evening shifts, 15.5% for working on night shifts, and 5% for working on weekend shifts.

Racketeering activity within the meaning of the R.I.C.O. or 18 U.S.C. § 1962(a) because the AHS unlawfully denied my entitlement to 15 and 10 minute breaks.

**112. Count No. 16.** Against the Alameda Health System and the California Department of Industrial Relations.

Civil conspiracy within the meaning of 42 U.S.C. § 1985.

Both the Alameda Health System and the Department of Industrial Relations unlawfully conspired with each other with a goal to deny my right for relief pursuant to the Federal laws.

**113. Count No. 17.** Against the Alameda Health System and the California Department of Industrial Relations.

Slavery and involuntary servitude in violation of the Thirteenth Amendment to the U.S. Constitution.

Because I was fired from the AHS, I was coerced to work asa Careguver taking care of elderly physically and mentally disabled people. This is slavery and involuntary servitude in violation of the Thirteenth Amendment to the U.S. Constitution.

**114. Count No. 18.** Against the Alameda Health System and the California Department of Industrial Relations.

Cruel and unusual punishment in violation of the Eighth Amendment to the U.S. Constitution.

I was fired from the AHS for asking questions about unpaid wages, unsafe working conditions, missed breaks, the denial of my affiliation to the Union, and for asking to transfer me to a full time job because I was actually working full time.

The DIR failed to reinstate me back to work at the AHS and accused me in committing medical negligence towards the patient.

Complaint for Damages.

This is a cruel and unusual punishment in violation of the Eighth Amendment to the U.S. Constitution.

### 115. Prayer for Relief.

116. I am demanding a Jury trial.

117. I am demanding to be reinstated back to work at the Alameda Health System and to receive all my lost salary and benefits as a result of retaliation and unlawful termination of my employment from the AHS in 2013.

118. The AHS terminated my employment in 2013 that is over 8.5 years ago. For all this time, I've been deprived of the basic needs. I was unemployed and underemployed. I was subjected to slavery and involuntary servitude, I was subjected to a cruel and unusual punishment, I didn't have a permanent place of living, I didn't have health insurance, I didn't have a car, I didn't have an opportunity to get a better paid job, and I didn't have an opportunity to study.

119. For the purpose of this pleading, I will not describe a full range of the damages that I am demanding. I will only cite the case law *Juarez v. AutoZone Stores, Inc.,* Case No. 08-CV-00417-WVG (S.D. Cal. Nov. 17, 2014) that was a court case in the United States District Court for the Southern District of California which is believed to be the largest single-plaintiff employment verdict in United States history at $185,872,719.52.

120. Because both the AHS and the DIR refused to reinstate me back to work for 8.5 years, I am demanding two hundred and fifty million dollars from the Alameda Health System and two hundred and fifty million dollars from the Department of Industrial Relations.

### Verification.

I, a Pro Se Plaintiff Tatyana Drevaleva, am a Party to this action. I have prepared and read the foregoing pleading and know its contents. The facts alleged in the pleading are within my own knowledge and I know these facts to be true.

Complaint for Damages.

1        I declare under penalty of perjury and under the Federal laws that the foregoing is true

2  and correct and that this verification was executed on this 14th day of March 2022 at San

3  Francisco, California. Respectfully submitted,

4        Date: March 14, 2022             Sign Name:

5

6                                     Tatyana E. Drevaleva

7                         Print Name:  Tatyana E. Drevaleva

Complaint for Damages.